# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CASE NO.:

C.A., a minor, by his parents and legal
guardians, C.A. and R.A.

     Plaintiffs,

                    **COMPLAINT FOR DAMAGES**

v.

BOARD OF DIRECTORS OF CORVIAN           (Jury Trial Demanded)
COMMUNITY SCHOOL, and CORVIAN
COMMUNITY SCHOOL,

     Defendant.

## PRELIMINARY STATEMENT

1.      C.A., C.A., and R.A. file this complaint against Corvian Community School ("Defendant"), for its failure to provide C.A. a free appropriate public education (FAPE), in violation of the Individuals with Disabilities Education Improvement Act ("IDEA") and corresponding state law, and discriminatory conduct against Plaintiffs based on C.A.'s disability in an education program receiving federal funds, in violation of Section 504 of the Rehabilitation Act and Title II of the Americans with Disabilities Act.

2.      Defendants, by and through persons acting under color of state law, deprived Plaintiffs of their federal constitutional rights in violation of 42 U.S.C. § 1983.

1

3.    Plaintiffs were injured and are entitled to recover damages caused by Defendants'

      actions

### **JURISDICTION & VENUE**

4.    Plaintiffs requested a Due Process Hearing with the North Carolina Office of

      Administrative Hearings on April 27, 2021. The Administrative Law Judge had

      jurisdiction over this matter pursuant to Chapters 115C and 150B of the North

      Carolina General Statutes and 20 U.S.C. § 1400 *et seq.*

5.    The parties appealed the Administrative Law Judge's ("ALJ") decision to the State

      Hearing Review Officer. The State Hearing Review Officer had jurisdiction over this

      matter pursuant to Chapter 115C of the North Carolina General Statutes and 20 U.S.C.

      § 1400 *et seq.*

6.    This Court has jurisdiction of actions brought under 20 U.S.C. § 1415 pursuant to 20

      U.S.C. §1415(i)(3)(A) without regard to the amount in controversy.

7.    Venue is properly laid in the United States District Court for the Western District of

      North Carolina because Defendant is located within Mecklenburg County, which is

      in the Western District of North Carolina and a substantial part of the acts or

      omissions giving rise to this complaint arose from events occurring within this

      judicial district.

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, which gives federal district courts jurisdiction over all civil actions arising under the Constitution, laws, and treaties of the United States.

9.      This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1343(a), which gives federal district courts original jurisdiction over (a) any civil action authorized by law to be brought by any person to redress the deprivation, under color of any State Law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; and (b) any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of the civil rights.

10.     This Court has the authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure; 28 U.S.C. §§ 2201 and 2202; and 20 U.S.C. § 1682.

11.     This is an action arising under the laws of the United States and an action by Plaintiffs, who are aggrieved by the actions and inactions of Defendants, decisions of the Administrative Law Judge below pursuant to 20 U.S.C. § 1415(f), and a decision of a State Hearing Review Officer pursuant to 20 U.S.C. § 1415(g).

12.     This Complaint is timely filed under 20 U.S.C. § 1415(i)(2)(B) and N.C. Gen.

3

Stat. 115C-109.9(d), which provides that any appeal of a due process decision must be filed in a State court of competent jurisdiction or a district court of the United States, within thirty (30) or ninety (90) days, respectively, of the date of decision by a hearing officer.

13. On August 23, 2021, the Honorable Selina Malherbe, serving as an Administrative Law Judge ("ALJ Malherbe") at the request of the Office of Administrative Hearings for the State of North Carolina, issued a written Final Decision Order of Dismissal without hearing any substantive facts in the matter. ("OAH Decision").[1] The OAH Decision did not make any findings of fact or conclusions of law based upon the alleged facts in the Plaintiffs' Due Process Petition. There were no findings of fact regarding the denial of a "free appropriate public education" ("FAPE") to C.A. by Corvian Community Schools ("Defendant," or "Corvian," or "District") under the Individuals with Disability Education (Improvement) Act, 20 U.S.C. §§ 1400 *et seq.*, ("IDEA"), and concomitant provisions of North Carolina law applicable to the education of children with disabilities, N.C. Gen. Stat. §§ 115C-106.1 *et seq.*, and NC Department of Public Instruction ("DPI") Policy 1500 *et seq.* and claims relating to Section 504 of the Rehabilitation Act of 1974 ("Section 504") 29 U.S.C. §794 and Title II of the Americans with Disabilities Act ("ADA") 42 U.S.C. §§ 12131 *et. seq.*, were similarly dismissed.

14. Plaintiffs appealed the ALJ Decision. DPI hired Joe D. Walters to serve as the State Review Officer ("SRO Walters"). On October 28, 2021, SRO Walters issued a written

---

[1] Exhibit A-Office of Administrative Hearings Decision.

Decision upholding ALJ Malherbe's Decision to dismiss the case without allowing

C.A. due process of law regarding allegations of Defendant's denial of FAPE, and

discrimination under the Title II of the ADA and Section 504.[2]

15.    On October 28, 2021, SRO Walters issued a written Decision ("SRO Decision"). The

SRO Decision set forth Findings of Fact and Conclusions of Law in favor of

Defendants herein. The SRO Decision failed to consider supplemental material in

accordance with N.C. Policy 15-4-1.15(iii) and the Memorandum of Understanding

("MOU") between the Office of Administrative Hearings ("OAH") and Department

of Public Instruction ("DPI"), the State Educational Agency ("SEA") in North

Carolina. No findings of fact were made regarding the Defendant's alleged denial of

a FAPE to C.A. for the 2019-20 or 2020-21 school years under the Individuals with

Disability Education (Improvement) Act, 20 U.S.C. §§ 1400 et seq., ("IDEA"), and

concomitant provisions of North Carolina law applicable to the education of children

with disabilities, N.C. Gen. Stat. §§ 115C-106.1 et seq., and NC DPI Policy 1500 et

seq. Like the OAH Decision, no findings of fact were made regarding claims under

Section 504, 29 U.S.C. §794, and the ADA, 42 U.S.C. §§ 12131 *et. seq.*,

16.    Plaintiffs further bring this action to redress deprivation of Plaintiffs' constitutional

rights under the Fourteenth Amendment of the United States Constitution pursuant to

42 U.S.C. § 1983.

---

[2] Exhibit B-State Review Officer's Decision.

17.     Plaintiffs have exhausted all appropriate administrative remedies.

18.     True and correct copies of the OAH Decision and the SRO Decision are attached

        hereto as Exhibit A and Exhibit B, respectively.

## APPLICABLE LAW AND POLICY

19.     The Individuals with Disabilities Education Improvement Act of 2004 ("IDEA")

        requires that states make available a FAPE to all children with disabilities residing in

        the state. 20 U.S.C. § 1412(a)(1)(A). The IDEA sets forth procedural and substantive

        requirements to which Defendants must adhere to ensure that each child with a

        disability receives a FAPE. 20 U.S.C. § 1401 *et seq.*

20.     The purposes of the IDEA include "ensur[ing] that all children with disabilities have

        available to them a free appropriate public education that emphasizes special

        education and related services designed to meet their unique needs and prepare them

        for further education, employment, and independent living." 20 U.S.C. §

        1400(d)(1)(A).

21.     One of the central mandates of the IDEA is to educate children with disabilities in the

        least restrictive environment (LRE), requiring:

>       To the maximum extent appropriate, children with disabilities
>       are educated with children who are not disabled, and special classes,
>       separate schooling, or other removal of children with disabilities
>       from the regular educational environment occurs only when the
>       nature or severity of the disability of a child is such that education
>       in regular classes with the use of supplementary aids and services
>       cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A).

6

22.    When reauthorizing the IDEA in 2004, Congress found "the implementation of this chapter ha[d] been impeded by low expectations, and an insufficient focus on applying replicable research on proven methods of teaching and learning for children with disabilities," 20 U.S.C. § 1400(c)(4), and renewed its commitment to placing children with disabilities in the regular education environment. In doing so, Congress relied on "[a]lmost 30 years of research and experience . . . demonstrat[ing] that the education of children with disabilities can be made more effective by . . . having high expectations for such children and ensuring their access to the general curriculum in the regular classroom, to the maximum extent possible." 20 U.S.C. § 1400(c)(5).

23.    Defendant, a local educational agency ("LEA"), must "ha[ve] in effect policies, procedures, and programs that are consistent with the State policies and procedures" established under the IDEA in providing for the education of children with disabilities within its jurisdiction. 20 U.S.C. § 1413(a)(1).

24.    Pursuant to the IDEA, the State of North Carolina set forth such policies and procedures in North Carolina General Statutes Section 115C, Article 9.

25.    The IDEA requires the LEA to develop, review, and revise annually an individualized education program ("IEP") enabling each child with a disability in the LEA to receive a FAPE. 20 U.S.C. § 1412(a)(4); 34 C.F.R. § 300.112 (Westlaw current through 2019).

26.    Among other things, the IEP must include "a statement of the child's present levels of academic achievement and functional performance," "a statement of measurable annual goals," "a description of how the child's progress toward

7

meeting the annual goals . . . will be measured," "a statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child," and "an explanation to the extent, if any, to which the child will not participate with nondisabled children." 20 U.S.C. § 1414(d)(1)(A)(i); *see* 34 C.F.R. § 300.320 (Westlaw current through 2022).

27. The LEA must convene an IEP meeting at least annually to review the IEP "to determine whether the annual goals for the child are being achieved" and revise the IEP to address "[a]ny lack of expected progress towards the annual goals," "[t]he results of any reevaluation," "[i]information about the child provided to, or by, the parents," "[t]he child's anticipated needs," and "[o]this matters." 34 C.F.R. § 300.324(b) (Westlaw current through 2022).

28. The IEP Team must include a representative of the public agency ("LEA representative") who is "qualified to provide, or supervise the provision of, specially designed instruction to meet the unique needs of children with disabilities," "knowledgeable about the general education curriculum," and "knowledgeable about the availability of resources of the public agency." 34 C.F.R. § 300.321(4) (Westlaw current through 2022).

29. The LEA must provide the parents with written notice ("Prior Written Notice" or "PWN") before the LEA proposes or refuses "to initiate or change the identification, evaluation, or educational placement of the child or provision of FAPE to the child." 20 U.S.C. § 1415(b)(3); 34 C.F.R. § 300.503(a)(Westlaw current through 2022). The IDEA requires that the PWN include certain

8

information, including "a description of the action proposed or refused by the agency" and "an explanation of why the agency proposes or refuses to take the action and a description of each evaluation procedure, assessment, record, or report the agency used as a basis for the proposed or refused action." 20 U.S.C. § 1415(c)(1).

30.     The LEA "must conduct a full and individual initial evaluation . . . before the initial provision of special education and related services to a child with a disability." 34 C.F.R. § 300.301(a)(Westlaw Current through 2022). At least once every three (3) years, the LEA must ensure that a reevaluation of the child is conducted "[i]f the public agency determines that the educational or related service's needs, including improved academic achievement and functional performance, of the child warrant a reevaluation" or "[i]f the child's parent or teacher requests a reevaluation." 34 C.F.R. § 300.303(a)(Westlaw Current through 2022).

31.     The IDEA mandates that for children with behaviors that impede their education or others, schools should "consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior." 20 U.S.C 1414(d)(3)(B)(i); 34 C.F.R. § 300.324(a)(2(i)(Westlaw Current through 2022).

32.     The IDEA mandates the SEA develop and submit a plan to the federal government providing assurances to the Secretary that the State has in effect policies and procedures to ensure compliance with the IDEA in areas including FAPE, full educational opportunity, individualized education program, least restrictive environment, and procedural safeguards. 20 U.S.C. § 1412(a).

9

33.     Section 504 prohibits public entities, including LEAs, from "exclud[ing] from the participation in, [ ] den[ying] the benefits of, or [ ] subject[ing] to discrimination" any otherwise qualified person with a disability from any program or activity receiving federal financial assistance solely by reason of his or his disability. 29 U.S.C. § 794(a). Title II of the ADA ("Title II") contains nearly identical antidiscrimination mandates as Section 504. 42 U.S.C. § 12132.

34.     Section 504 applies to each recipient of federal financial assistance from the Department of Education and to the program or activity that receives such assistance. 34 C.F.R. § 104.2. Defendants Board and State Board are recipients to whom the Section 504 applies. 34 C.F.R. § 104.3(f).

35.     Section 504 requires that "a recipient that operates a public elementary or secondary education program or activity . . . provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap." 34 C.F.R. § 104.33(a). An "appropriate education" is defined as "the provision of regular or special education and related aids and services that are (i) designed to meet individual educational needs of handicapped persons as adequately as the needs of nonhandicapped persons are met and (ii) are based upon adherence to procedures that satisfy the requirements of §§104.34, 104.35, and 104.36." 34 C.F.R. § 104.33(b).

36.     Section 504 also presumes the inclusion of disabled students:

> A recipient to which this subpart applies shall educate, or shall provide for the education of, each qualified handicapped person in its jurisdiction with persons who are not handicapped to the maximum extent appropriate to the needs of the handicapped

10

person. A recipient shall place a handicapped person in the regular educational environment operated by the recipient unless it is demonstrated by the recipient that the education of the person in the regular environment with the use of supplementary aids and services cannot be achieved satisfactorily. Whenever a recipient places a person in a setting other than the regular educational environment pursuant to this paragraph, it shall take into account the proximity of the alternate setting to the person's home.

34 C.F.R. § 104.34(a).

37.     Pursuant to 42 U.S.C. § 1983, "every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or others proper proceeding for redress."

38.     The Fourteenth Amendment to the United States Constitution provides in pertinent part that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

## THE PARTIES

39.     PLAINTIFF C.A. ("Student" or "C.A.") is a citizen of the United States, who at the time of the violations alleged herein, resided with his parents, Courtney Aseltine and Rich Aseltine in Huntersville, North Carolina, which is located in Mecklenburg County, North Carolina. At all times relevant herein, Student was, and continues to be a minor, having been born in the year 2014. At the time of the violations of law alleged herein, Student was eligible for special education and related services under the IDEA and North Carolina law.

11

40.     Student is also a qualified individual with a disability within the meaning of all applicable statutes, including Section 504 and the ADA.

41.     PLAINTIFF COURTNEY ASELTINE ("Mrs. Aseltine," "Mother,") and PLAINTIFF RICH ASELTINE ("Mr. Aseltine," "Father," or R.A.) (Collectively "Mr. and Mrs. Aseltine," "C.A. and R.A.," or "the Aseltines.") are citizens of the United States, who at the time of the violations of law alleged herein, resided in Huntersville, North Carolina, which is within Mecklenburg County, North Carolina.

42.     DEFENDANT BOARD OF DIRECTORS OF CORVIAN COMMUNITY SCHOOL ("Corvian's Board") is a non-profit corporation organized and existing under the laws of the State of North Carolina and is located within Mecklenburg County, North Carolina. The purposes of Corvian's Board are to operate a charter school pursuant to the provisions of North Carolina Charter School Statutes (N.C. Gen. Stat. §§ 115C-218 et seq.), and to pursue related educational endeavors. As such, Corvian's Board is a "local educational agency" ("LEA") as that phrase is defined by 20 U.S.C. § 1401(19) and N.C. Gen. Stat. 115C-106.3(11), and is obligated to provide administrative control or direction of, or to perform a service function for, elementary and secondary charter school students. At all times relevant herein, Corvian's Board was required to ensure that Defendant Corvian Community School provided Student with full and equal access to the public education programs and activities it offers in compliance with the requirements of state and federal laws, including, but not limited to, ensuring that Student received a FAPE in the least restrictive environment ("LRE") under the IDEA and North Carolina law.

43.     DEFENDANT CORVIAN COMMUNITY SCHOOL ("Defendant," "District," "CCS" or "Corvian") is a public charter school organized and existing under the laws of the State of North Carolina and is located within Mecklenburg County, North Carolina. Defendant is a LEA, as that phrase is used in the IDEA, 20 U.S.C. § 1401 *et seq.*, and the Family Educational Rights and Privacy Act ("FERPA"), and as such receives financial assistance from the United States Department of Education and is responsible for providing a FAPE to disabled children, including C.A.  At all times relevant herein, Corvian was the LEA responsible for providing Student with full and equal access to the public education programs and activities it offers in compliance with the requirements of state and federal laws including, but not limited to, providing Student with a FAPE in the LRE under the IDEA. Defendant is a "person" as defined by 42 U.S.C. § 1983 (2000). Defendant is a recipient of federal funds within the meaning of 20 U.S.C. § 1681. Defendant is governed by the laws of North Carolina, the laws of the United States, and the Constitutions of the United States and North Carolina in carrying out these duties and responsibilities.

44.     Every act or omission attributed to an employee of Defendant was performed or omitted during the course and scope of that employee's employment with the Defendant.

## FACTUAL ALLEGATIONS

### Denial of FAPE

45.     C.A. is a seven year old, second grade student who qualifies for special education services under the primary category of hearing impaired ("HI"). The Student, C.A., has a severe hearing impairment which has been treated since infancy. He has a history of

13

bilateral enlarged vestibular aqueduct ("EVA") and subsequent sensorineural hearing loss. He uses a cochlear implant in his left ear and wears a hearing aid in his right ear. Because of his EVA, he is at risk for a sudden decrease or complete loss of hearing in his right ear. C.A. has delayed receptive and expressive language and receives speech-language services in these areas. C.A. has also been diagnosed with mild-moderate sensory processing disorder and a specific learning disability in reading and written expression as well as dyslexia.

46. Mr. and Mrs. Aseltine are not special education teachers. Mrs. Aseltine has completed training in special education advocacy since filing the Due Process Petition, beginning her training in March 2021 after realizing she did not have the needed skills to advocate for her own child.

47. Previously, C.A. attended Bright Beginnings, a preschool program, at Barnette Elementary in Huntersville, NC. Barnette Elementary is a North Carolina Public School in the Charlotte Mecklenburg School District ("CMS"). While attending Bright Beginnings, C.A. had an IEP ("CMS IEP").

48. During the 2019-20 and 2020-21 school years, C.A. was enrolled at Defendant Corvian Community School.

49. On or about December 2, 2020, the Aseltines filed a formal complaint with the North Carolina Department of Public Instruction Exceptional Children Division.

50. C.A. is currently privately placed at John Crosland School in Charlotte, North Carolina.

51.     C.A.'s disabilities affect his ability in the areas of academics, behavioral, functional, social, and other educational areas. Because of his disabilities, it is difficult for C.A. to participate in grade-level curriculum without supports and modifications.

52.     C.A.'s multiple disabilities make it difficult for him to learn in a home-hospital virtual environment.  Because of his disabilities, when the Aseltines filed their Due Process Petition, C.A. could not read or write independently.

53.     April 27, 2020 is not the date that Mr. and Mrs. Aseltine had knowledge of Defendant's violations of their child's rights.

54.     "The petition for a due process hearing must allege a violation that occurred not more than one year before the date the parent or LEA knew or should have known about the alleged action that forms the basis of the due process petition, except that the exceptions that apply to the timelines described in NC 1504-1.4(a)(1) and (2) apply to the timeline in this section." NC 1504-1.8(a)(2); *see also* 34 CFR 300.507(a)(2).

55.     Upon information and belief, the Defendant did not explain the purpose of the Parent Rights & Responsibilities in Special Education Notice of Procedural Safeguards July 2016 ("Parent Handbook"). The Parent Handbook does not discuss a child's right to: not be forced into home-hospital virtual placement; not be denied general education services because of his disabilities; be evaluated in all suspected areas; a functional behavior assessment, behavioral intervention plans, assistive technology evaluations, or reading evaluations; extended school year ("ESY") services; be provided measurable IEP goals and appropriate PLAAFPs; receive services in his least restrictive environment; be in a proper placement; appropriate auxiliary aides, supplementary aides, and services based on severe hearing impairments.  Further, the

15

Parent Handbook does not discuss or explain that the District could place a child in a private school while the District was not providing for in-person instruction.

56. Even if the Aseltines received a copy of the Parent Handbook, many of the claims in the Petition for Contested Case Hearing ("Petition") are not discussed in the Parent Handbook.

57. The Aseltines were not made aware of many of the violations identified in their Petition until after meeting with undersigned counsel, and only after receiving their child's educational records from the Defendant.

58. On or about March 16, 2020, the District forcibly changed C.A.'s placement from general education to home-hospital virtual without parental input and without providing his parents the opportunity to meaningfully participate. During this time the District also failed to implement C.A.'s IEP. The Aseltines did not have an opportunity to participate in the change of placement decision. The Aseltines were told they had no choice but to allow C.A. to be served in the most restrictive setting.

59. The Aseltines were not provided an opportunity to request additional supports and services while C.A. was unilaterally placed on home-hospital virtual.

60. The Aseltines were not familiar enough of the IDEA process to fully understand their rights were being violated when the District unilaterally changed C.A.'s placement from general education to home-hospital virtual.

61. The District did not hold an IEP meeting until May 8, 2020, and they still determined his least restrictive environment was in the general education placement.

62. From March 16, 2020, through May 10, 2020, C.A. was entitled to receive comparable services as was provided in his CMS IEP. Upon information and belief,

the District did not provide those comparable services between March 16, 2020, through May 10, 2020.

63.    From May 11, 2020, through the end of the 2019-20 school year, C.A. did not receive all of the special education and related services outlined in his May 8, 2020, IEP.

64.    Due to his disabilities, C.A. struggled to access the curriculum while attending school in the home-hospital virtual placement during the 2019-20 school year.

65.    As a result, C.A. regressed.

66.    During the COVID-19 pandemic of 2020, the Defendant failed to provide special education and related services in the least restrictive environment by forcing C.A. to be served in the virtual home-hospital placement.

67.    On March 14, 2020, Governor Roy Cooper issued Executive Order No. 117 due to the coronavirus pandemic. Governor Cooper shut down the public-school buildings but did not tell school districts that it could stop complying with the requirements of the IDEA.

68.    On March 23, 2020, Governor Cooper extended the school building shut down for all North Carolina public school districts. Like Executive Order No. 117, Governor Cooper did not tell school districts that it could stop complying with the IDEA.

69.    On April 27, 2020, the United States Congress gave the United States Secretary of Education the ability to seek a waiver of the substantive requirements of the IDEA. The US Department of Education determined that it would not request any authority to waive the requirements of public-school districts to provide a free appropriate public education in the least restrictive environment to children with disabilities. More specifically, the document states the following:

17

During the month of March 2020, the United States Department of Education developed a document titled "Questions and Answer on Providing Services to Children with Disabilities During the Coronavirus Disease 2019 Outbreak. In this document, the US Department of Education reminded public school districts that public school districts "must make every effort to provide special education and related services to the child in accordance with the child's individualized education program."

70. The North Carolina Department of Public Instruction advised North Carolina school districts that it must receive agreement from parents prior to amending an IEP.

71. Prior to the 2020-21 school year, in response to COVID-19, North Carolina gave all public schools the option of allowing students to receive their education in-person or virtually.

72. Governor Roy Cooper gave public schools the following instructional options:

> • Plan A: Minimal Social Distancing – Will be implemented if state COVID-19 metrics stabilize or move in a positive direction. All requirements in this guidance apply to Plan A.
> • Plan B: Moderate Social Distancing – All requirements in this guidance apply, with additional requirements in the Social Distancing and Minimizing Exposure and Transportation sections.
> • Plan C: Remote Learning Only – Will be implemented only if state COVID-19 metrics worsen significantly enough to require suspension of in-person instruction and the implementation of remote learning for all students, based on the remote learning plans required by Session Law 2020-3. Most of the requirements in this guidance would not apply, as students and staff would not be gathering together in groups on school grounds.

73. On September 17, 2020, North Carolina gave all schools the option to choose between options A, B, and C. In other words, Corvian had the opportunity to allow C.A. to receive his special education and related services in-person via option A. Although Mr. and Mrs. Aseltine raised concerns about C.A.'s ability to hear instruction in the virtual home hospital setting, Corvian disregarded the concerns related to C.A.'s inability to hear instruction and denied C.A. access to special

18

education and related services in his least restrictive environment-general education placement.

74.     In or around October 2020, the District developed a plan to return to in-person learning.  On or about October 2, 2020, the District contacted Mrs. Aseltine about C.A.'s schedule for in person learning, emphasizing "[C.A.] needs to be in school all four days each week." Upon information and belief, the District began bringing students back to non-remote instruction on October 12, 2020, for four (4) modified days each week, however, C.A. was not invited to return to in-person instruction in October 2020. He was required to wait an additional four (4) weeks before being invited to learn in-person.

75.     On November 9, 2020, Corvian reopened its elementary campus to all students. C.A. was invited to attend in-person instruction four (4) days each week because he had an IEP. On November 12, 2020, Corvian's elementary campus flooded.

76.     Teacher notes from the week of November 9, 2020, indicate C.A. needs prompting to stay attentive to the lesson, even during in-person instruction.

77.     Following the flooding, Corvian decided to move its elementary students back to 100% remote learning. The change in placement following the flooding in November constituted a change in placement that the Aseltines were not involved in making. There is no category of "remote" or "virtual" learning for determining placement in the least restrictive environment ("LRE").

78.     When a student is not able to be educated in the school, the placement category is considered "Homebound Instruction" and is the most restrictive environment available.

79. Due to C.A.'s disabilities, and complex needs with regard to instruction, C.A. was unable to independently utilize technology for any of the services offered by the District.

80. The Aseltines informed the District that C.A. was still unable to access virtual instruction but the District refused to consider in-person services from Corvian staff and employees, including contract service-providers.

81. Upon information and belief, following the flooding of the elementary campus in November 2020, Corvian created a rubric to determine which EC students would attend in-person classes and which would remain 100% home-hospital virtual, rather than looking at the individual needs of each child. By having only two options on the rubric, Corvian did not consider the continuum of services or learning environments available for C.A.

82. On or about December 1, 2020, Mrs. Aseltine reached out via email to Kristi Miller, Sara McKinney, and Holly Chapman regarding EC students attending school in-person at the high school campus. That same day, Kristi Miller replied to that email that the "highest needs students with the greatest service time requirements were able to return safely using a high school classroom." Also on December 1, 2020, Kristi Miller suggested waiting until December 18, 2020, during a previously scheduled IEP meeting to discuss C.A.'s placement. She indicated that was an appropriate wait time to make a decision despite the Aseltines continued concern that C.A. was not accessing the curriculum. In her response, she (again) compared C.A. to other students who receive the same or similar services rather than focusing on him as an individual learner.

20

83. In an occupational therapy evaluation, it was noted that C.A. had "symptoms of mild-moderate sensory processing disorder that interfere with his ability to access his education," and that these symptoms are exacerbated by the digital learning environment because of the added stimuli present. While participating in a home-hospital virtual lesson, C.A. was noted to have deficits in visual fixation and visual attention, and is not able to engage in his learning because he is often inattentive or distracted.

84. The District also had an opportunity to provide C.A. with in-person services via a private school placement until it was able to offer in-person services but refused to offer that option.

85. On or about December 6, 2020, C.A. was seen by Dr. Kimberly Block, a privately hired audiologist. In the report, it was indicated that C.A. should receive instruction in-person. The District was provided a copy of this report.

86. Upon information and belief, Corvian began using a new audiologist, Rachel Randell, in December. Also, upon information and belief, upon reviewing the audiology report for C.A., Ms. Randell asked if in-person learning was an option, pointing out that C.A.'s current adaptive equipment does not improve the teacher's audio signal to his hearing aid, which is his preferred way of hearing instruction (as opposed to his Cochlear Implant ("CI")). In a more formal report prepared for an IEP meeting, she advised the District that Mr. or Mrs. Aseltine could review the lesson information with C.A. to confirm he is understanding it since he cannot read closed captioning and did not have access to in-person instruction or support personnel.

87.     On December 18, 2020, the District held an IEP meeting in which critical team members were not invited/were not present. Because these team members were not present, a placement decision was not made and the discussion was tabled until January 15, 2021, over a month and a half after the initial request to meet regarding C.A.'s placement, and over two months after the elementary campus had flooded.

88.     Also, during the December 18, 2020 meeting, a shortened school day was considered but rejected by the IEP team when it decided to table the discussion until January 15, 2021.

89.     The District continued to deny C.A. in-person services, general education placement citing inadequate space as the primary reason.

90.     In December 2020, Mrs. Aseltine reached out to the chair and co-chair of the board of directors of Corvian with concerns about the way the school was handling C.A.'s placement and services. She did not receive a response.

91.     On or about January 20, 2021, Kristi Miller contacted Mr. and Mrs. Aseltine about a proposal for C.A. to return to in-person for EC service time only, and not any academic instruction. The offer was contingent upon the Aseltines withdrawing their state complaint, which they did not do.

92.     On or about February 14, 2021, during an IEP meeting, Mrs. Aseltine asked for clarification as to why her child was not placed in the least restrictive environment when other children from the District were receiving their IEP/EC services in person. Corvian's response was that only students who are at the maximum resource or self-contained levels were receiving in-person services.

93.     At the March 5, 2021, IEP meeting, the District did not consider a continuum of services. The options offered for consideration were to remain 100% home-hospital virtual or to attend school in the self-contained classroom (at the high school campus due to flooding at the elementary school in November of 2020.) Neither option was C.A.'s least restrictive environment according to his most recent IEP. At no point during the meeting was the team asked what would be an appropriate learning environment given C.A.'s unique needs.

94.     Due to being placed on the home-hospital virtual placement, C.A. missed sessions if his parents were unavailable to sit down with him and log him into his device for the virtual meetings. This would not be an issue if C.A. were able to attend in-person services.

95.     C.A. did not receive adequate special education, general education, related services, supplementary aids, modifications, accommodations, and access to his non-disabled peers from the Corvian for the period of March 2020 through April 2021.

96.     The District could have provided an in-home service provider, teacher, teacher's aide, and/or tutor but refused to do so.

97.     The District said it was the parent's responsibility to provide the aforementioned services and supports.

98.     C.A.'s teachers indicated multiple times remote learning was not the best placement for him, but when given two options it was the better choice.

99.     The Defendant failed to provide appropriate special education and related services during the 2019-20 and 2020-21 school years.

100. As of the winter reporting period during the 2019-20 school year (the last fully in-person reporting period), C.A. was not making much progress, but demonstrated an understanding of the relationship between numbers and quantity and could count to 20. He also showed knowledge of his shapes and could compare 2D and 3D shapes. He was not adding or subtracting and could not count to 100 by ones or by tens.

101. A February 2019 Speech-Language Evaluation recommended, amongst other things, that C.A. receive pre-teaching by his parents regarding academic language and vocabulary due to moderate receptive and expressive language delays.

102. Upon information and belief, during the period of March 2019 through April 2021, the District did not provide all of the special education, related services and accommodations outlined in C.A.'s IEP

103. Due to COVID-19 remote learning, no end of year data was collected for C.A. for the 2019-2020 school year.

104. On or about August 21, 2020 Corvian provided a remote learning "contingency plan" for providing C.A. with EC services due to the school remaining closed due to COVID-19. The services provided under the contingency plan were not commensurate with the services outlined in the IEP. Only the live option included in the Contingency plan (Plan A) followed service times provided for in the IEP.

105. Before moving to the home-hospital virtual placement due to COVID-19, C.A. was not receiving interventions through the math or literacy lab.

106. During the time C.A. attended school in-person, he received Social/Emotional Consultation Services every day. When he was in home-hospital virtual environment,

services were sporadically provided, about once weekly, with some services being via email correspondence between teachers.

107. The home-hospital remote learning plan did not follow the schedule provided. Instead of receiving social skills/self-advocating services 3 days per week for 30 minutes, the contingency plan states C.A.'s provider would check in with C.A.'s teacher once weekly to see how he was doing with his social goals. The plan also included a discussion of how to make those sessions up at a later date. As of the date the Petition was filed, that had not happened.

108. Placement decisions continued to rely on the availability of space rather than C.A.'s needs for services.

109. Furthermore, the District consistently delayed the scheduling of IEP meetings to fit times that were convenient to it, without regard to how such scheduling delays would impact C.A.'s learning.

110. During the time C.A. was forcibly placed in the virtual home hospital setting, C.A.'s parents had to sit with him and provide one-on-one instruction including specialist recommended pre-teaching of skills.

111. On or about December 16, 2020, after the Aseltines filed a complaint with the North Carolina Department of Public Instruction, Exceptional Children Division, C.A. was placed in tier two (2) of the District's Multi-Tiered Systems of Support ("MTSS") program for both math and reading.

112. In February 2021, C.A. was reading at a level AA, which is the lowest level in the program used by Corvian, RazKids, which is designed for children ages 4-11. Per the RazKids website, level AA is a recovery level for students in first grade.

113. Since moving to remote learning, C.A. has regressed academically.

114. Defendant also failed to provide C.A. with access to a general education.

115. As a child with a disability, C.A. was entitled to receive general education services from the District.

116. Based solely on his disabilities, the District did not provide C.A. with differentiated general education between August 2020 to the present.

117. C.A. did not receive any physical education, health, art, recess, or opportunities to interact with his non-disabled peers between August 2020 and March 2020, aside from the three days he attended school in-person. As a child with social communication deficits, having access to enhancements and his non-disabled peers is critical to his success and progress.

118. Additionally, the District did not provide instruction on Fridays while operating remotely. This accounts for over six (6) weeks of lost instructional days. In lesson plans sent to the Plaintiffs, Fridays began to be designated as "Finish Up Friday" on or about December 4, 2020.

119. C.A. has regressed in many areas as a result of him not receiving his in-person comparable special education and related services and not having access to general education.

120. Defendant failed to provide supplementary aids, modifications, and accommodations during the 2019-20 and 2020-21 school years.

121. When students were required to move to remote learning due to COVID-19, Mrs. Aseltine expressed concerns about C.A. not being able to access the content of his

video lessons due to his inability to hear instruction because of background noise, poor video quality, and poor audio quality.

122. In C.A.'s May 2020 Annual Review meeting, Plaintiffs again expressed concern with C.A. not being able to access the curriculum due to his disability.

123. Mrs. Aseltine continued to express these concerns as C.A. continued to be unable to hear instruction while learning remotely.

124. Corvian did not provide services to assist C.A. with accessing the curriculum.

125. Corvian did not provide modifications to the delivery of instruction nor did Corvian provide accommodations that would make the lessons accessible to C.A.

126. Closed Captioning is not an appropriate accommodation for a student who does not read.

127. Using an FM or similar device to connect his CI to the listening device directly did not provide accessibility when the live lesson was a video that contained a video.

128. Corvian did not consider any other auxiliary aides, supplementary aides or other services to allow C.A. to access his special education and related services.

129. This issue continued to be raised at IEP meetings and continued to not be resolved.

130. Defendant did not timely conduct evaluations in all areas of concerns, specifically psycho-educational and occupational therapy, resulting in a Child Find Violation.

131. When C.A. enrolled at Corvian, he had an IEP from CMS which indicated C.A. "was not demonstrating the same skills as same aged peers in the areas of social-emotional, problem solving, using vocabulary, and rhyming/alliteration/noticing discrete units of sound/letter-sound correspondence."

27

132. On or about May 8, 2020, the District held an annual review IEP meeting. During this meeting, it was noted that C.A. had the necessary supports to continue communication, language, and academic proficiency although he has "moderate receptive and expressive delays with word structure, concept development and auditory memory deficits."

133. It was also noted that C.A. struggles with understanding of phonological information and hesitates to initiate conversation or communication with peers.

134. The IEP reflects C.A. has delayed receptive and expressive language and that during the 2019-20 school year C.A. was not making adequate progress on these goals.

135. Corvian informally proposed retaining C.A. but did not have data to support that decision.

136. On or about September 18, 2020, Judith Waid noted C.A. had slow processing and was behind where the teacher was during instruction.

137. Nearly a month later, on October 16, 2020 a virtual IEP meeting was held to open C.A.'s IEP for re-evaluation in the area of Occupational Therapy ("OT").

138. During the October 16 IEP meeting, it was noted that C.A. is struggling with reading.

139. Although it was aware C.A. was struggling with reading, Corvian did not include it as an area for evaluation at that time.

140. C.A.'s inadequate progress in mathematics was not discussed at the October 16 IEP meeting.

141. An OT evaluation from December 2020 showed C.A. had significant visual-motor integration and motor coordination deficits which impacted letter formation and

writing as well as accuracy, legibility, and speed. The report further showed that C.A.'s fine motor precision was well below average.

142.   On December 16, 2020, the Aseltines were notified of C.A.'s placement in the District's MTSS program. At the time of the notification, C.A. was not making adequate progress in his letter sounds or decoding skills. Additionally, C.A. was not making adequate progress in his goal of identifying age-appropriate vocabulary. Easy CBM data showed C.A. was not adequately growing, and in math regressed following being moved into MTSS Tier 3 in February 2021.

143.   After months of parent-expressed concerns over reading progress, a psycho-educational evaluation was conducted in February 2021. Based on data from that evaluation, C.A. is significantly below average in reading and written language.

144.   Despite much parent concern over C.A.'s levels of academic performance, the District continued to attribute many of C.A.'s struggles to outside factors rather than take responsibility for his regressions and missed signs of disability.

145.   Defendant did not provide C.A. with appropriate reading instruction during the 2019-20 and 2020-21 school years.

146.   The District was not providing C.A. with appropriate reading instruction during the 2019-20 and 2020-21 school years when it did not recognize his reading and writing disabilities.

147.   The District was on notice of parental concerns about C.A.'s lack of reading and writing progress but did not begin the MTSS process until well into the 2020-21 school year.

29

148. When the Aseltines expressed concerns about C.A.'s inability to read, the District often disregarded these concerns, comparing his lack of progress with other students and other families' struggles resulting from COVID-19 and remote learning constraints.

149. Multiple assessments conducted in 2021 year determined C.A. has a specific learning disability in reading and written expression. A private reading evaluation indicated C.A.'s weaknesses are consistent with a diagnosis of dyslexia, "a specific language-based reading disability characterized by difficulties with accurate and/or fluent work recognition and by poor spelling and decoding abilities. These difficulties typically result from a deficit in the phonological component of language." Problems with reading comprehension can also result from. The evaluation report indicated that even though C.A. received special education services related to his language/hearing impairment, they were not sufficient to address his work level reading and spelling difficulties. The recommendation from the evaluation was intensive and specialized intervention services directed toward his specific learning disability. This recommendation included 1:1 instruction or very small group instruction in-person in a school setting and additional supporting materials for practice at home. The reading evaluation also recommended ESY services based on the window of opportunity criteria.

150. The District did not provide appropriate reading instruction based on C.A.'s individual needs during the 2019-20 and 2020-21 school years.

151. Upon information and belief, the District fabricated data on a math assessment given on or about March 10. Upon information and belief, other data relating to C.A.'s

progress may have also been fabricated or misconstrued as showing progress when no progress was made.

152. One of the reasons the District provided for failing to identify C.A.'s deficiencies in reading was that it is normal for boys to not be able to read. The District also said failing does not indicate a child is not making progress.

153. C.A. would have demonstrated even less progress had Mrs. Alseltine not sacrificed her employment to stay and work with him and make him do his work, including sitting with him during instruction, providing cues, pre-teaching, and more.

154. It was not and is not the Plaintiffs' job to ensure C.A. is making academic progress.

155. Defendant failed to provide appropriate writing instruction during the 2019-20 and 2020-21 school years.

156. The psycho-educational evaluation conducted by Jill Gottlieb showed C.A. had a specific learning disability in written expression.

157. C.A. did not have a written expression goal in 2019-20 or 2020-21.

158. The District observed deficits in written expression prior to receiving the results of the psycho-educational evaluation in or about March, 2021.

159. These types of services are best provided in-person.

160. The District did not provide in-person services, or any services to help C.A. with this deficit.

161. The Defendant failed to provide occupational therapy services during the 2019-20 and 2020-21 school years. These types of services are best provided in-person. Further, the Defendant did not provide in-person services, or any services to help C.A. with this deficit until March 2021, when he returned to once weekly in-person

31

instruction to work on his IEP goals. Progress notes consistently showed a need for such services.

162. The Defendant did not implement C.A.'s IEPs during the 2019-20 and 2020-21 school years from about March 13, 2020 through April 2021.

163. When the District closed in March 2020 due to COVID-19, C.A. was not receiving all his IEP services.

164. During the 2020-21 school year, services were provided under a contingency plan rather than following the IEP.

165. When students returned to school in November 2020, C.A. was attending only four days per week, modifying how the IEP services would be delivered.

166. When students again returned to remote instruction in November 2020, the Defendant again used the contingency plan in lieu of C.A.'s IEP to provide services.

167. In February 2020, the Asselstine's received an updated contingency plan for C.A.'s return to in-person instruction. The plan indicated C.A. would be invited to attend in person instruction for four (4) days per week while the school is operating in the hybrid model, also referred to as Plan B.

168. On or about March 10, 2021 C.A. began attending in-person "check-in" classes at Corvian's high school campus. These are partial-day sessions held once weekly and all elementary students have been given check-in time.

169. The Defendant shortened the school day without Mr. or Mrs. Aseltine's consent.

170. When students returned to in-person check-in instruction, service times were again adjusted with modified contingency plans, instead of IEPs being followed.

171.    The District also failed to follow the contingency plan sent in February, keeping C.A. on once-weekly check-ins instead of the four (4) day a week in-person instruction. These check-in sessions are not an entire school day. They begin around 10:00 a.m. and end around 1:30 p.m.

172.    The District cited "unusual circumstances" as the reason C.A. was not able to receive his services in the least restrictive setting and as dictated by his IEP. The District also cited a lack of space as reason for not providing C.A. with four days of in-person instruction each week.

173.    On or about April 5, the District began bringing elementary students back for one day each week. In doing so, it again adjusted the length of the school day without parent consent, from 8:10 a.m.to 2:35 p.m. to 8:30 a.m. to 1:30 p.m.

174.    The failure to provide IEP services for much of the 2020-21 school year was related to a flood, not COVID-19.

175.    The Defendant made a decision to not provide C.A. with in-person services.

176.    Defendant had the option to place C.A. in a private school placement. Defendant did not offer C.A. the option of being placed in a private school when the School refused to offer in-person services. Defendant also could have offered private school placement temporarily until it decided to return to in-person services.

177.    C.A. has regressed significantly due to the Defendant's refusal to provide him with the special education, related services, supplementary aids, modifications, accommodations, and general education he is entitled to receive.

33

178. Defendant did not timely conduct a Functional Behavior Assessment ("FBA") and develop a Behavior Intervention Plan ("BIP") during the 2019-20 and 2020-21 school years to address C.A.'s behaviors.

179. When the IEP team met on October 16, 2020 to open a re-evaluation for the purposes of OT services, it was noted that C.A. had not had any disciplinary referrals that school year. Nothing was noted that when he attended in-person classes before the closure due to COVID-19, he did have disciplinary issues, most often during unstructured or noisy situations.

180. On October 28, 2019, the Defendant held a behavior meeting with Mr. and Mrs. Aseltine. No functional behavioral assessment ("FBA"), and no behavior intervention program ("BIP") resulted though there were disability-related behaviors noted, and most behaviors occurred during unstructured times when the noise levels could not be controlled/when there was a lot of non-instructional noise in the learning environment. Furthermore, nothing was noted regarding C.A.'s difficulty staying in his seat during remote instruction.

181. At the December 18, 2020, IEP meeting, as part of the reevaluation data, C.A.'s inappropriate behaviors were discussed at-length and resulted in a diagnosis of mild-moderate sensory processing disorder.

182. Defendant, in or about March 2020 expressed a concern that C.A. may have ADHD yet his report card marks "consistent" for paying attention.

183. As of the date the Due Process Petition was filed, Defendant had not conducted an FBA nor had it developed a BIP despite having behavior-related functional goals in his 2019-20 and 2020-21 IEPs.

34

184. On or about March 4, 2021, Corvian held a meeting with IEP team members excluding the parents. Upon information and belief, the District determined Corvian would not provide C.A. with placement other than remote learning. Upon information and belief, this decision was made prior to holding any IEP meetings with the Aseltines. Upon information and belief, this decision was not made based on an individualized assessment but based on a District policy regarding which elementary students would be allowed in-person services due to space constraints at the temporary location of the elementary campus.

185. Again, on or about March 11, 2021, Corvian again held a meeting with IEP team members and again excluding the parents. Upon information and belief, this "pre-meeting" was again held for the purposes of discussing C.A.'s academic placement.

186. During an IEP meeting held on March 12, 2021, Corvian staff admitted to meeting to discuss C.A.'s placement options without the Mr. and Mrs. Aseltine present. Staff further admitted this is a normal practice of theirs and they "do it all the time."

187. These meetings denied the Aseltines meaningful parental participation in their child's IEP. Because of this, the predetermination meetings held in March did not allow the Aseltines to provide input on the educational placement of their child.

188. Defendant failed to provide C.A. with Extended School Year ("ESY") Services.

189. As noted above, upon information and belief, C.A. did not receive the special education and related services he was entitled to receive the period of March 2020 through June 2020. As a result, C.A. regressed academically, behaviorally, socially, and functionally.

190. Due to his disability, C.A. has an unknown window of opportunity to hear.

35

191.     On May 8, 2020, the District held an IEP meeting. At this meeting, the District

created a prior written notice. The prior written notice did not indicate the District

discussed ESY or the three criteria to determine ESY. For example, the section titled

Explanations of Action(s) Proposed does not include the word "extended school

year": As such, the prior written notice does not indicate what discussions were held

to determine C.A.'s eligibility for ESY. The District did not make a final decision on

ESY and left the section blank. Upon information and belief, the Defendant did not

discuss any of the following criteria at the May 8, 2020 IEP meeting:

> Whether the student regresses or may regress during extended breaks from
> instruction and cannot relearn the lost skills within a reasonable time; or
>
> Whether the benefits a student gains during the regular school year will be
> significantly jeopardized if he or she is not provided with an educational
> program during extended breaks from instruction; or
>
> Whether the student is demonstrating emerging critical skill acquisition
> ("window of opportunity") that will be lost without the provision of an
> educational program during extended breaks from instruction.

192.     Moreover, Mr. and Mrs. Aseltine requested all of C.A.'s educational records and

there are not any other records or meeting minutes that indicate the District

considered the three criteria for ESY.

193.     Upon information and belief, C.A. was struggling with issues related to his hearing

impairment, behavior, reading and writing that would have supported providing him

with ESY. But, the District decided to not make a decision which resulted in C.A.

being denied ESY for the 2020 summer

194.     Upon information and belief, the District failed to provide report cards for the third trimester of the 2019-20 school year and through April 27, 2021, had not provided report cards during the 2020-2021 school year.

195.     The District did not provide C.A. with means to engage in effective communication.

196.     The District did not conduct sufficient assessments to determine which auxiliary aides and services were necessary to allow C.A. to engage in effective communication.

197.     Upon information and belief, the District did not consider the following examples of auxiliary aides and services to allow C.A. effectively communicate: interpreters, note takers, real-time computer-aided transcription services (for example, CART), assistive listening systems, accessible electronic and information technology, and open and closed captioning.

198.     Upon information and belief, the District did not consider conducting an assistive technology evaluation to determine which auxiliary aides and services would allow C.A. to effectively communicate.

199.     Upon information and belief, the Alsetines were not provided opportunities to address C.A.'s effective communication needs because they were not made aware of their right to request auxiliary aides and services focused solely on allowing C.A. the opportunity to effectively communicate.

**Section 504 Violations**

200.     C.A. is substantially limited in the major life activities of hearing, learning, communicating, reading, concentrating, and processing. Therefore, C.A. is a qualified individual with disabilities.

37

201. Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, provides that no qualified individual with a disability "shall, solely by reason of her or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance ...."

202. Defendant receives federal financial assistance.

203. Defendant intentionally discriminated and engaged in gross misjudgment and denied C.A. the benefits of its program and activity based solely because of C.A.'s disability.

204. The Defendant acted in bad faith and engaged in gross misjudgment based solely on C.A.'s disability when it failed to provide special education and related services during the 2019-20 and 2020-2021 school years.

205. The Defendant acted in bad faith and engaged in gross misjudgment based solely on C.A.'s disability when it failed to address his behavioral needs during the 2019-20 and 2020-2021 school years.

206. The Defendant acted in bad faith and engaged in gross misjudgment based solely on C.A.'s disability when it failed to provide auxiliary aides and services to allow C.A. the ability to effectively communicate during the 2019-20 and 2020-2021 school years.

207. The Defendant acted in bad faith and engaged in gross misjudgment based solely on C.A.'s disability when it failed to provide general education, accommodations, and related services during the 2019-20 and 2020-2021 school years.

208.    The Defendant acted in bad faith and engaged in gross misjudgment based solely on C.A.'s disability when it failed to identify his reading, writing, and processing disabilities.

209.    The *Fry* decision requires administrative exhaustion of any Section 504 and ADA claims that are related to the denial of FAPE. *Fry v. Napoleon Comty. Sch.*, 137 S. Ct. 743, 754 (2017).

210.    There are three exceptions to the administrative exhaustion requirement. *Z.G. ex rel C.G. v. Pamlico Cnty Pub. Sch. Bd. of Educ.*, 744 F. App'x 769, (4th Cir. 2018). The requirement is waived "(1) when the administrative process would have been futile; (2) when a school board failed to give parents proper notification of their administrative rights; or (3) when administrative exhaustion would have worked severe harm upon a disabled child." *MM ex rel. DM v. Sch. Dist. of Greenville Cty.*, 303 F.3d 523, 536 (4th Cir. 2002).

211.    Plaintiffs complied with the *Fry* standard by bringing related IDEA, Section 504 and ADA claims together in their Petition.

**ADA Violations**

212.    Plaintiffs incorporate by reference all of the foregoing allegations as though fully set forth here.

213.    Defendant excluded C.A. from programs, services or benefits "by reason of his disability" in violation of Title II of the ADA.

214.    C.A. is a qualified individual a with disability pursuant to 42 U.S.C. § 12131(2).

215.    The Defendant is a public entity.

216. Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

217. Defendant has failed to provide auxiliary aids and services to ensure C.A. received the benefits of the services, programs, and activities offered by the Defendant when it failed to provide appropriate educational services during the 2019-20 and 2020- 2021 school years.

218. Defendant acted in bad faith and engaged in gross misjudgment when it failed to provide appropriate special education and related services during the 2019-20 and 2020- 21 school years.

219. Defendant acted in bad faith and engaged in gross misjudgment when it significantly reduced C.A.'s special education and related services during the 2019-20 and 2020- 21 school year while C.A. was receiving home-hospital virtual instruction.

220. Defendant acted in bad faith and engaged in gross misjudgment by meeting before IEP meetings to predetermine decisions that are to be made by the entire IEP team.

221. Defendant acted in bad faith and engaged in gross misjudgment resulting in retaliation against the Plaintiffs by predetermining placement decisions prior to multiple IEP meetings.

222. Defendant acted in bad faith and engaged in gross misjudgment by denying C.A. the opportunity to receive general education services in an in-person setting following the flooding of its elementary campus.

223. Defendant acted in bad faith and engaged in gross misjudgment when it disregarded Mrs. Aseltine's May 2020 concerns about C.A.'s difficulty understanding and lack of progress during remote learning.

224. Defendant acted in bad faith and engaged in gross misjudgment when it stated that scoring zeros on assessments is not a sign that a student is not making progress.

225. Defendant acted in bad faith and engaged in gross misjudgment when it did not reopen its elementary campus following flooding in November or 2020.

226. Defendant acted in bad faith and engaged in gross misjudgment when it did not address C.A.'s behavioral needs.

227. Defendant acted in bad faith and engaged in gross misjudgment when it did not provide sufficient auxiliary aides and services to address C.A.'s communication needs to allow him to effectively communicate.

**Filing of Contested Case Petition and Procedural History**

228. On April 27, 2021 C.A., a minor, by and through his parents filed a Petition. The Petition alleged that Corvian had denied C.A. his procedural and substantive rights to FAPE under the IDEA and alleged violations of Section 504 and the ADA.

229. On May 19, 2021, a Joint Motion to continue the hearing was filed, and an order granting the Motion was entered on May 19, 2021.

230. Also, on May 19, 2021, Defendant filed a Motion to Dismiss. Subsequent memoranda were filed supporting and opposing the Motion to Dismiss. An order granting in part (dismissing all ADA and 504 claims) and denying in part (dismissing all claims

41

outside of April 27, 2020-the beginning of the 2020-2021 school year) was issued on
June 21, 2021.

231.   On July 1, 2021 the Plaintiffs filed a Motion to Reconsider the dismissal.  In support
of their Motion to Reconsider, Plaintiffs included an OSEP memo Stating "an issue in
a State complaint can also be the subject of a due process complaint requesting a due
process hearing, as long as the issue relates to a matter regarding the identification,
evaluation, or educational placement of a child with a disability, or the provision of
FAPE to the child, as described in 34 CFR §300.507(a)(1)." Plaintiffs also requested
reconsideration of matters relating to alleged child find violations under the knew or
should have known ("KOSHK") standard found at 20 U.S.C. § 1415(f)(3)(C).
Neither of these matters were for the *policy* reasons that were investigated under the
State Complaint and are allowed per the OSEP memo. Additionally, the June 21,
2021 Motion to Reconsider addressed the standard set under *Fry v. Napoleon Cmty.
Sch.*, which requires administrative exhaustion of 504 and ADA claims relating to a
denial of FAPE.

232.   On July 6, the Parties held a mediation. The mediation was adjourned in part due to
an outstanding Motion to Reconsider.

233.   Defendant filed a Response to the Motion to Reconsider on July 9, 2021.  An order
was issued denying the Motion to Reconsider in its entirety on July 15, 2021.

234.   The Defendant requested discovery from the Plaintiffs.  Part of the discovery requests
included social media posts, text messages, emails, evaluation protocols, screening
forms, treatment records, logs of services, progress monitoring for an indefinite time
period. These requests are unduly burdensome; the Petitioners did not have easy

42

access to things such as evaluation protocols, screening forms, or other treatment records--especially when some of the individuals only conducted an evaluation of C.A.

235.     On July 7, 2021, the Defendant filed its first Motion to Compel. (*Id.*) On July 12, 2021, the Plaintiffs filed a Motion to Continue.

236.     On Monday, July 19, 2021, Ms. Viktoriya Tsuprenko, ALJ Malherbe's paralegal, reached out to the Parties' counsel stating the following, "Please advise if you are available to participate in a conference call with Judge Malherbe to discuss scheduling during the following times [. . .]" A conference call was scheduled for July 20, 2021 at 11 AM.  At no time prior to this call was the subject matter changed to include any topics other than scheduling. During the July 20, 2021 call, which did not have a court reporter present and which was for the purpose of "scheduling," per email communications with the parties, ALJ Malherbe opened a discussion on the [Defendant]'s Motion to Compel. Plaintiffs were not prepared for oral arguments on this matter and were caught off guard by this discussion. Furthermore, the absence of a court reporter precluded the existence of a record of what was discussed in the matter.  During this call, Plaintiffs emphasized they had not yet narrowed down a list of experts for a number of reasons, and that under the IDEA's five-day disclosures, they were not mandated to do so until the pre-hearing conference on the matter.

237.     On July 21, 2021, two orders were issued. (Order Compelling Discovery Responses and Order of Continuance.) The first was an Order of Continuance. The Order of Continuance specifically indicated that "Stipulations, final witness lists, and marked exhibits shall be exchanged between the parties on or before August 23, 2021." The

43

Order of Continuance specifically allows the Plaintiffs to provide their final witness list five days before August 23, 2021. The second was an order compelling Mr. and Mrs. Aseltine to "fully answer and verify Defendant's discovery requests regarding expert witnesses sent on June 3, 2021." Mr. and Mrs. Aseltine had one day from the telephone call, and mere hours from the issuance of the Order Compelling Discovery Responses to piece together a list of potential expert witnesses and communicate with their clients regarding the verification of these discovery requests. Mr. and Mrs. Aseltine produced a list of all known potential expert witnesses in compliance with the order. At the time of production, there were no contracts in existence--in-part because it was still uncertain whether the hearing would take place or if the matter would be settled, and in-part because the matter was not yet in the scope of the IDEA's five-day disclosure period, the July 21, 2021, Order of Continuance requiring disclosure of final witness lists five days before August 23, 2021, and the Plaintiffs wanted to ensure any experts they contracted with were of the best use of their limited litigation funds.

238. On July 26, 2021, Defendant filed a Motion for Sanctions claiming the Plaintiffs' responses fell short of the Order to Compel. In their Response, Plaintiffs emphasized it was not possible to produce contracts with experts when no such contracts existed. Plaintiffs further stated that some expert records and educational records sought were actually materials controlled by and in the possession of the Defendant. In an attempt to secure the records for production from all named potential experts, Plaintiffs issued subpoenas. Several of these subpoenas were issued to individuals operating under a

44

contract with the Defendant. If the Aseltines had these records in their possession, they would not have needed to subpoena the records of these individuals.

239. A conference call was held on August 2, 2021, to discuss the Respondent's Motion for Sanctions. Again, a court reporter was not present.

240. Defendant sought via discovery: social media posts, text messages, emails, evaluation protocols, screening forms, treatment records, logs of services, progress monitoring for an indefinite time period. These requests are unduly burdensome; the Petitioners did not have easy access to things such as evaluation protocols, screening forms, or other treatment records--especially when some of the individuals only conducted an evaluation of C.A.

241. Also on August 2, 2021, Respondent filed a Second Motion for Sanctions. Defendant claimed Mr. and Mrs. Aseltine failed to produce social media posts and other materials not in their possession relating to C.A.'s educational record.

242. Mr. and Mrs. Aseltine produced thousands of pages of discovery. Further, Mr. and Mrs. Aseltine continued to produce records of the sixteen proposed expert witnesses even after the Court denied their use of those expert witnesses.

243. There were numerous instances when the Aseltines produced and supplemented responses to the Respondent's discovery requests. When they were unable to produce responsive documents, they took additional steps to securing them, including issuing subpoenas. Although subpoenas were issued to all proposed expert witnesses, Dr. Glori Gray moved to quash the subpoena and did not produce any records because the evaluation had already been produced to both parties and Mr. and Mrs. Aseltine did not receive any additional responsive documents outside of the evaluation from Ms.

45

Heidi Tringali.  Outside of a lawfully issued subpoena and simply requesting records, Mr. and Mrs. Aseltine had no other way to secure documents.

244.    A response to Motion for Sanctions was filed on August 12, 2021.

245.    An oral argument was held on August 18, 2021, with attorneys Keith Howard, Kelli Espaillat, Carla Fassbender, Gil Middlebrooks, and the Honorable Judge Malherbe and court reporter Elaine F. Hayes present via video conferencing.

246.    During the August 18, 2021 hearing, Mr. and Mrs. Aseltine, through their attorneys, requested a continuance and additional time to receive and produce any additional records, but were denied the continuance. (Trial Tr. at 64.)

247.    A Final Decision Order of Dismissal was entered on August 23, 2021.  The Honorable Judge Malherbe advised the Defendant's attorney to draft the final decision order.  The proposed order included several items that were not discussed during the oral argument.[3]  Further, the proposed order made a claim that the court considered lesser sanctions which was not true.  Undersigned counsel sent an alternative proposed order which the Honorable Judge Malherbe did not accept.[4]  The Final Decision Order indicated that the court considered lesser alternatives and other matters that were not considered during the oral argument.  Similarly, prior to the Final Decision Order, the Honorable Judge Malherbe did not review the relevant documents to demonstrate Plaintiffs' compliance with the discovery requests.  Moreover, during the oral argument, Defendant's counsel made accusations related to Plaintiffs' withholding of social media posts that were used to justify the Final

---

[3] Exhibit C-Proposed Order.
[4] Exhibit D-Plaintiff's Proposed Revisions to Order.

46

Decision Order which were not verified or substantiated by the Honorable Judge Malherbe prior to or after issuing the Order.

248.     On August 18, 2021, the Court directed Respondent to draft the Final Decision Order of Dismissal when it stated "So, Mr. Middlebrooks, why don't you draft something for me? Do what we did last time. Send it in an attachment as an e-mail, please.". (Hr'g Tr. 66.) The Court did not draft its own decision and essentially excepted the proposed final decision from Respondent with very few changes.

249.     On September 20, 2021, Plaintiffs filed a Notice of Appeal and SRO Walters was assigned to the matter.

250.     On October 22, 2021, Plaintiffs' Memorandum of Law in Support of Notice of Appeal of Final Decision with DPI. Supplemental exhibits were included with the Memorandum of Law in Support of Notice of Appeal.[5] SRO Walters refused to consider any supplemental information, including thousands of pages of discovery which the Plaintiffs had provided to the Defendant. The supplemental information would have provided SRO Walters information demonstrating compliance with the Defendant's request for discovery.

251.     Also, on October 22, 2021, Defendant filed a Brief in Support of ALJ Decision and a separate email correspondence objecting to the use of any evidence outside the official record in the matter.

252.     On October 23, 2021, Defendant filed an Initial Brief of Corvian Community School Addressing the 14 SRO Exhibits in which the Defendant objected to their inclusion as necessary evidence although nowhere in the record was there actual evidence as to

_____
[5] Exhibit E-Email and Exhibits Submitted to SRO Joe Walters.

47

what specifically had been disclosed by the parties, especially the Plaintiffs, through the discovery process and which would not typically be submitted to the OAH apart from that which is submitted subject to the IDEA's five-day rule.

253. On October 25, 2021, Plaintiff filed a Motion to Submit Additional Evidence [. . .] and a Motion to Exclude Respondent's Initial Brief of Corvian Community School Addressing the 14 SRO Exhibits. Both motions were denied on October 26, 2021.

254. On October 28, 2021, the SRO Walters issued his decision. The SRO Decision upheld all rulings of ALJ Malherbe.

255. C.A. has exhausted all remedies available to him under the IDEA as required by 20 U.S.C. § 1415(l), and in any case, should be excused from further exhaustion on grounds that further exhaustion would be futile.

## WAIVER OF SOVEREIGN IMMUNITY

256. The Fourth Circuit Court of Appeals has recognized that Congress can abrogate a state's qualified immunity without state consent if it acts "pursuant to a valid exercise of constitutional power sufficient to abrogate the immunity and it unequivocally expresses its intent to do so." *Litman v. George Mason Univ.*, 186 F.3d 544, 549 (4th Cir. 1999).

257. Defendant receives federal financial assistance under the IDEA. By "voluntarily participating in federal spending programs" such as the IDEA, where Congress has expressed a "clear intent to condition participation in the progra[m] . . . on a State's consent to waive its constitutional immunity," Defendant has waived sovereign immunity. *Id*. at 550.

48

258. Additionally, pursuant to N.C. Gen. Stat. § 115C–42, "by securing liability insurance as hereinafter provided, [school districts are] hereby authorized and empowered to waive its governmental immunity from liability."

259. Upon information and belief, Defendant has purchased a General Liability Coverage policy. To the extent that Defendant uses this insurance to indemnify itself, it waives its sovereign immunity.

## CLAIMS FOR RELIEF

### COUNT I

*Appeal of OAH Decision*

260. Plaintiffs incorporate all preceding paragraphs into this Count by reference as if fully stated herein.

261. Plaintiffs are a "party aggrieved" by the OAH Decision within the meaning of 20 U.S.C. §1415(i)(2)(A).

262. Plaintiffs assert that the OAH decision does not meet the standard of being careful and thorough, and therefore should not be accorded the deference, which the Court in its discretion, may provide to an administrative decision by an Administrative Law Judge.

263. For a number of reasons, including, but not limited to, the reasons set forth below, the Plaintiffs respectfully request this Court reverse the ALJ Decisions to (1) limit the scope of the case (2) compel discovery and limit witnesses, and (3) dismiss the case prior to due process proceedings.

49

I. **The ALJ's Interlocutory Orders Limiting the Scope of the Case Were Issued in Error and were not Regularly Made.**

264. Under the IDEA, a district has a duty to find and identify children with disabilities. 20 U.S. Code § 1412(a)(3). When a district fails in that duty, the time for the statute of limitations to run is from the date in which the party knew or should have known of the violation (KOSHK). *G.L. v. Ligonier Valley Sch. Dist. Auth*, 802 F.3d 601, 613 (3d. Cir. 2015). Further, in instances of child find violations, where the case is brought within one year of the KOSHK date, the child is entitled to services from the time of the violation, and is not limited to the one-year look-back period established by "Under the discovery rule, a plaintiff's time to bring suit is not in any way shortened by his or her reasonable ignorance: "the statutory limitations period begins to run and the plaintiff is afforded the full limitations period, starting from the point of [discovery]"". *Id.*

265. Courts have repeatedly held that parents cannot be expected to automatically know when their child's rights under IDEA are being violated. *See Demarcus v. Dist. of C.*, 190 F. Supp. 3d 35, (2016). Because of this, the District has the burden of showing that the parents were aware the child was entitled to services he or she was not receiving.

266. In *Draper*, the 11th Circuit upheld a district court's determination that a student's claim challenging placement was not time barred because the parents did not have the information necessary to know that the student had been injured by the placement until they received results of a re-evaluation. *Draper v. Atlanta*, 518 F.3d 1275, 1288.

267. In an unpublished case, *K.H.*, a district court found that a student did not have the "critical facts" necessary to know he had an IDEA claim until after receiving the results of an independent evaluation. *K.H. v. New York City Dep't of Educ.,* 63 IDELR 295 at 18. (Pet'r Ex 4.)

268. In this case, much like in *Draper* and *K.H.*, a new evaluation and a new diagnosis were paramount to the knowledge on behalf of Mr. and Mrs. Aseltine.

269. In its Motion to Dismiss, the Respondent did not present evidence showing Mr. and Mrs. Aseltine had knowledge of claims occurring prior to the filing of the case.

270. Plaintiffs did not have copies of independent evaluations showing diagnosis of C.A.'s additional disabilities until as late as April, 2021 yet ALJ Malherbe refused to consider any claims arising prior to April 27, 2020, a date which predated the Aseltine's knowledge of denial of FAPE by nearly a year.

271. Many of C.A.'s evaluation results were shared with Mr. and Mrs. Aseltine in early 2021, yet ALJ Malherbe did not adjust the KOSHK date to account for this.

272. Because ALJ Malherbe based her decision solely on the date of occurrence without establishing a KOSHK date her reasoning was flawed and the Order to Dismiss on this issue was in conflict with well-established legal precedent. As such, the dismissal of claims brought under the Child Find provisions of the IDEA was in error and an abuse of discretion.

273. Further, because the decision was based on judicial error and an abuse of discretion, it was not regularly made.

274. ALJ Malherbe also erred when dismissing claims related to the state complaint filed by Mr. and Mrs. Aseltine.

51

275. Based on the July 23, 2013 OSEP Memorandum titled *Dispute Resolution Procedures under Part B of the IDEA*, "an issue in a State complaint can also be the subject of a due process complaint requesting a due process hearing, as long as the issue relates to a matter regarding the identification, evaluation, or educational placement of a child with a disability, or the provision of FAPE to the child, as described in 34 CFR §300.507(a)(1)."

276. The issues presented in the Petition subject to this Complaint relate to the identification, evaluation, or educational placement of a child with a disability and the provision of FAPE to the child, as described in 34 CFR §300.507(a)(1).

277. There is no preclusion of future claims following the resolution of a state complaint. Here, the State Complaint was resolved on February 1, 2021 yet ALJ Malherbe dismissed all claims that occurred after the February 1, 2021 decision even though those claims were not in existence at the time of the resolution of the state complaint.

278. Additionally, numerous allegations relating to the 2020-21 school year occurred after the Petitioners filed their December 3, 2020, State Complaint.

279. Furthermore, in an email received from Poly Lilly on February 11, 2021, it was noted that Petitioners had additional remedies available, including filing a state complaint or due process petition regarding whether a student requires in-person instruction.

280. It was improper and a lack of discretion for ALJ Malherbe to dismiss claims from the beginning of the 2020-21 school year through April 27, 2021. Further, doing so was in error and the decision was not regularly made.

281. Further, The judge in administrative hearings may determine whether a particular claim is within the statutory authority of the agency. N.C. Gen. Stat. §150B-33(9).

ALJ Malherbe could have allowed the Section 504 and ADA claims to continue through supplemental jurisdiction when they were brought under the same facts and circumstances as the IDEA claims.

II.     The ALJ Order to Compel Discovery and Limit Witnesses Denied Plaintiffs their
        right to Due Process Proceedings Under the IDEA

282.    The IDEA is designed to be an expedited proceeding not subject to the same rules of civil procedure as cases heard in state court.  To emphasize this, the IDEA includes procedural safeguards which include a five-day discovery rule which does not require the production of exhibits or witness lists until at least five days prior to a hearing on the matter.

283.    North Carolina's Discovery Rule, under the Rules of Civil Procedure, codified as General Statute § 1A-26, does not require discovery of the matters compelled by ALJ Malherbe, nor does it support a full dismissal of a case for the failure to produce such requests.

284.    The scope of discovery generally allows for "discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party,"  however, the discovery rule allows for specific objections to production of electronically stored materials under Rule 34(b), which states, "[...] the response may state an objection to production of electronically stored information from sources that the party identifies as not reasonably accessible because of undue burden or cost." N.C. Gen. Stat § 1A-34(b)

285.    If such an objection is made, the requesting party may file a motion to compel pursuant to Rule 37. "If defendant fails to respond or specifically object to a request

53

within forty-five days, or such other time the court states otherwise, the serving party, upon reasonable notice, may move to compel discovery under N.C. Gen. Stat. § 1A–1, Rule 37(a) (1990)." *Wagoner v. Elkin City Sch.'s Bd. of Educ.*, 113 N.C. App. 579, 585, 440 S.E.2d 119, 123 (1994) (citing to N.C. Gen. Stat. § 1A–1(34); Rule 34).

286. While information is generally discoverable and may be compelled, there are limitations set forth under Rule 37(b1) that prohibit a court from imposing sanctions on a party "for failing to provide electronically stored information lost as a result of routine, good-faith operation of an electronic information system." N.C. Gen. Stat. § 1A-37(b1). Additionally, Rule 26 limits metadata discovery

287. A party requesting discovery has the burden of proving information is both relevant and necessary to claims or defenses. Defendant did not meet this burden. *Wagoner,* 113 N.C. App at 584-85.

288. Information sought through discovery must be such that it can lead to information relating to a claim or defense. N.C. Gen. Stat. § 1A-26.

289. In this matter, the Respondent sought via discovery: social media posts, text messages, emails, evaluation protocols, screening forms, treatment records, logs of services, progress monitoring for an indefinite time period. These requests are unduly burdensome; the Petitioners did not have easy access to things such as evaluation protocols, screening forms, or other treatment records--especially when some of the individuals only conducted an evaluation of C.A.

290. Discovery in the form of thousands of pages of material was provided by the Plaintiffs to the Defendant. The Plaintiffs' Petition was dismissed over Mrs. Aseltine's social media posts and alleged, unfounded statements made by Mrs.

54

Aseltine on social media. Mrs. Aseltine is not the party responsible with providing C.A. a FAPE. Defendant failed to provide a showing of relevancy of the posts she made on her social media accounts.

291. Mrs. Aseltine admitted freely through the discovery process that she had participated in advocacy training beginning in or around March, 2021, and that the focus of her social media pages was often related to her own thoughts about advocating for C.A.

292. Defendant did not make a showing of any of the requested records being relevant to whether Corvian denied C.A. a FAPE.

293. The matter before this court relates to C.A.'s education. At the time the discovery requests were made, ALJ Malherbe had already limited the scope of the lawsuit to a very limited period of time (April 27, 2020-August 2020).

294. The scope of the social media discovery request was "from the start of the 2019-2020 school year to present, list by date and social media platform each post to social media by Courtney Aseltine that addresses educational issues (not including her on-line teaching classes)." This request exceeded the very limited period in question before the OAH and did not relate specifically to the education of C.A.

295. During the August 18, 2021, hearing, the Respondent stated the purpose for seeking extensive social media records was to impeach Mrs. Aseltine. (Trial Tr. at 13, 43.) At that time, she had not even been called as a witness. Mrs. Aseltine was not C.A.'s educator during the period at issue. She has not been responsible for his education in any capacity other than the role which any parent would serve. She has no responsibility to provide her child with a FAPE.

55

296. Because the discovery request related specifically to the parent's social media posts about education, and not the District's posts, there is very little that could be viewed as relevant to whether C.A. was denied a FAPE.

297. Proceedings make it appear as though the Plaintiffs failed to produce any discovery despite the production of thousands of pages thereof. ALJ Malherbe issued multiple orders in this case without verifying this and instead taking the word of the Defendant's attorney over the Plaintiffs' attorney.

298. With regard to Facebook posts, Mrs. Aseltine did produce all posts she had made in response to the discovery requests despite it taking her a significant amount of time to sort through her personal posts for those relating in any way to her child's education and not her own experience as an educator. (Hr'g Tr. 2d. Mot. Compel, pg. 21 at 19-21, Aug. 18, 2021.) She also provided the Facebook posts she had made in a private Facebook group for parents whose children attended Corvian.

299. Providing the information requested was time consuming. To further sort through the information, or to obtain metadata that she was unable to obtain in her initial requests would be unduly burdensome.

300. When "taking into account the needs of the case, the amount in controversy, limitations on the parties' resources, and the importance of the issues at stake in the litigation" it is unreasonable to expect a parent to spend excessive time and money attempting to procure electronically stored information that is not available to them. N.C. Gen. Stat. § 1a-26(1a)(iii).

301. An ALJ has the discretion to determine what weight to give expert witnesses.

302.	ALJ Malherbe opted to limit witnesses to preclude the use of expert witnesses in the Petition filed by Mr. and Mrs. Aseltine as part of her First Order to Compel Discovery.

303.	 Mr. and Mrs. Aseltine relied on the five-day rule as they decided whom they were calling as witnesses and what exhibits they were going to offer as evidence.  Under traditional discovery rules, parties are provided 90 days before the hearing to produce discovery.  Because of the strict timelines in due process hearings, the amount of time allowed for discovery is shortened, which places a burden on parents.  The shortened time-frame makes it very difficult to obtain information from individuals not directly employed by the school system, such as independent education evaluators or medical providers.  More specifically, medical providers are notorious for not providing medical records in a timely manner.  Despite that, Mr. and Mrs. Aseltine produced any and all documentation in their possession upon receipt of that information.

304.	Further, Mr. and Mrs. Aseltine continued to produce records of the sixteen proposed expert witnesses even after the Court denied their use of those expert witnesses.

305.	In issuing conflicting orders on the same day, ALJ Malherbe's decisions were not regularly made. The Order Compelling Discovery required production of expert witness lists by 5:00 p.m. on July 21, 2021, while the Order of Continuance specifically required parties to provide the following: "Stipulations, final witness lists, and marked exhibits shall be exchanged between the parties on or before August 23, 2021."

306.	These contradictory Orders were issued on the same day, however only the Order Continuing the hearing followed the five-day disclosure rule outlined in the IDEA

regarding the production of expert witness information and exhibits. The Order

Compelling Discovery was not regularly made for the aforementioned reasons.

307.     There were numerous instances when the Aseltines produced and supplemented

responses to the Respondent's discovery requests. When they were unable to produce

responsive documents, they took additional steps to securing them, including issuing

subpoenas. Although subpoenas were issued to all proposed expert witnesses, Dr.

Glori Gray moved to quash the subpoena and did not produce any records because the

evaluation had already been produced to both parties and Mr. and Mrs. Aseltine did

not receive any additional responsive documents outside of the evaluation from Ms.

Heidi Tringali.  Outside of a lawfully issued subpoena and simply requesting records,

Mr. and Mrs. Aseltine had no other way to secure documents.

308.     Defendant had the same right to subpoena records but chose not to.

309.     Defendant had in its possession many of the records requested of the Plaintiffs

through discovery.

310.     ALJ Malherbe erred and abused her discretion when she issued her Final Decision

Order of Dismissal without requiring the Defendant to prove requests for social media

posts and evaluator records were both relevant and necessary to its case.

III. ALJ Malherbe Denied the opportunity to use Expert Witnesses after giving only 1 day to
provide expert witnesses lists.

311.     An ALJ has the discretion to determine what weight to give expert witnesses.

312.     Rather than determine the weight to give each witness following testimony at a

hearing, ALJ Malherbe opted to limit witnesses and to preclude the use of expert

witnesses in the hearing on the Due Process Petition filed by Mr. and Mrs. Aseltine as

part of her First Order to Compel Discovery.

58

313.     ALJ Malherbe made this decision after providing Plaintiffs less than 24 hours.  Her

decision did not provide Plaintiffs adequate time to identify expert witnesses or their

opinions due to the one day limitation.

314.     Further, in her First Order to Compel Discovery, ALJ Malherbe implied Plaintiffs'

attorneys had a duty to inspect their client's personal property. Although an attorney

has a duty to take reasonable steps to ensure their client is complying with discovery,

an attorney does not have a duty to inspect their client's personal property. N.C. Gen.

Stat., 1A-1, Rule 26(a) outlines the discovery methods utilized in North Carolina.

Rule 26(a) specifically states:

> (a) Discovery methods.--Parties may obtain discovery by one or more
> of the following methods: depositions upon oral examination or written
> questions; written interrogatories; production of documents or things or
> permission to enter upon land or other property, for inspection and other
> purposes; physical and mental examinations; and requests for
> admission. N.C. Gen. Stat. Ann. 1A-1, 26(a).

315.     Nowhere in Rule 26 are attorneys required to seize and inspect their clients'

computers, cell phones, iPads, tablets, or other electronic devices to find social

media posts or other electronically stored information, or require attorneys to

interrogate and question the clients' veracity.   In addition, there are no

requirements in N.C. Gen. Stat., §§ 1A-1, Rules 26 through 37 that require the

seizure of electronic devices and the interrogation of an attorney's clients.

316.     The Plaintiffs' Attorneys took all necessary steps including suggesting to Mrs.

Aseltine ways to obtain the information sought, notifying the opposing party of the

difficulty in downloading the posts, subsequently notifying the opposing party of the

unavailability of the posts, and noting during the August 18, 2021 hearing that the

59

Respondent had the option at any time to subpoena records, as the Petitioner had to do with regard to medical and evaluation records.

317.     The IDEA does not provide for Discovery beyond the five-day disclosure rule.  *E.g.*, *Horen v. Bd. of Educ. of Toledo Pub. Sch. Dist.*, 655 F. Supp. 2d 794, 806 (N.D. Ohio 2009).

318.     The IDEA is designed to allow parents to make claims against a school system when the parents believe their child was denied a FAPE. 20 U.S.C. § 1415(b)(6). It is meant to be a simple process. *Id*. at § 1415(b)(7).

319.     The process was never intended to be lengthy or costly to the parents or school district.  Rather, the right to a due process hearing under the IDEA is meant to ensure a child's rights are protected. *Id.* at § 1415(b)(2).

320.     Because the IDEA provides statutory provisions relating to production of exhibits and witness lists, under the doctrine of *expressio unius est exclusio alterius,* the provisions of the IDEA would prevail over the North Carolina Rules of Civil Procedure. *See Coleman v. Wake Cnty. Bd. of Educ*, 2020 WL 534914 * 4 (E.D.N.C., Feb. 3, 2020) (citing *Wilkie v. City of Boiling Spring Lakes*, 370 N.C. 540, 547 (2018); *N.L.R.B. v. SW Gen. Inc*, 137 S. Ct. 929, 950 (2017)).

321.     Under the IDEA and related state law, disclosures pertaining to exhibits and witnesses are not required until five days before the hearing and is often referred to as the "five-day disclosure period." 34 CFR § 300.512(b); NC 1504-1.13(b)(1).

322.     Because the provisions of the IDEA would prevail in a conflict of laws matter, the IDEA's five day disclosure rules would supersede any jurisdictional requirement to

produce exhibits or witness lists prior to five business days before the start of the due process hearing.

323. At the time ALJ Malherbe issued her First Order to Compel Discovery, Mr. and Mrs. Aseltine were in the planning stages with their attorneys and further were hoping to settle the matter through mediation. There were no contractual agreements with experts existing at any time prior to the case being dismissed on August 18, 2021.

324. Mr. and Mrs. Aseltine provided responses to the Second Set of Discovery on July 30, 2021, thirty days before the scheduled due process hearing and twenty-five days before the five-day disclosure rule. (34 C.F.R. § 300.512.)

325. The ALJ Malherbe misstates the facts in paragraph nine of the Final Decision Order when she says "Petitioner produced a few documents from Margaret Knott, Rebecca Felton, and Kimberly Block on August 9th and 12th, weeks after having been ordered to do so in this tribunal's July 21st Order Compelling Discovery was granted and a week after Corvian filed its Second Motion to Compel and for Sanctions."[6] (Final Decision Order of Dismissal at 2.)

326. No discovery or documents were filed with the court, so the court could only make an assumption that Mr. and Mrs. Aseltine "produced a few documents."

327. Production from Mr. and Mrs. Aseltine consisted of much more than a few documents, rather there were thousands of pages of documents produced in response to Defendant's discovery requests.

328. Defendant had a duty to keep educational records for C.A., not Mr. and Mrs. Aseltine.

---

[6] Exhibit A at 2.

329.    ALJ, without direct evidence as to what had been produced during discovery, only

argument on the matter, reduced the Plaintiff's ability to use expert witnesses prior to

the IDEA's five day disclosure requirements

## COUNT II
*The OAH Final Decision was not regularly made.*

330.    Dismissal of a Due Process Petition over unrelated social media posts by the

Student's parent and based on an unfounded statement by the District's attorney in

which the ALJ relied on in making the final decision deviates from the standard of

regularly made.

331.    Further, ALJ Malherbe relied on the District's attorney to provide the order, and

through email correspondence told her she was required to keep the language that she

"had considered lesser sanctions," although the hearing transcript indicates she did

not do so.

332.    ALJ Malherbe based part of the dismissal on the fact that the attorneys did not inspect

the clients' electronic devices.

333.    There is no express right to discovery under the IDEA and the Code of Federal

Regulations. The purpose and intent of filing due process complaints, as illustrated

by North Carolina's simple due process petition form, is to streamline the process and

make it easier for parents to file petitions for contested case hearings. Further, this

concept is displayed through the brief timeline that Due Process hearings are to

follow as set forth in the IDEA. 34 C.F.R. § 300.515(a).

334.    The IDEA provides "[a]t least five business days prior to a hearing conducted

pursuant to § 300.511(a), each party must disclose to all other parties all evaluations

completed by that date and recommendations based on the offering party's

62

evaluations that the party intends to use at the hearing." 34 C.F.R. § 300.512. Similarly, Honorable Judge Malherbe in her July 2, 2021, Order of Continuance required the parties to exchange "[s]tipulations, final witness lists, and marked exhibits … on or before August 23, 2021."

335.    ALJ Malherbe chose to ignore the federal and her July 21, 2021, Order when requiring Mr. and Mrs. Aseltine to produce expert witness lists less than 24 hours after the issuance of the July 21, 2021 Order to Compel Discovery.

336.    ALJ Malherbe did not meaningfully consider lesser sanctions before dismissing the matter over a discovery-related conflict between the parties and without actually examining records of what had been produced by the Plaintiffs through discovery.

337.    "Rule 37 sanctions are powers granted to the trial courts of our state to prevent or eliminate dilatory tactics on the part of unscrupulous attorneys or litigants. *Essex Grp., Inc. v. Express Wire Servs., Inc.*, 157 N.C. App. 360, 363, 578 S.E.2d 705, 707 (2003).  Before issuing a severe sanction such as dismissal, an administrative court must consider lesser sanctions.  *Batlle v. Sabates*, 198 N.C. App. 407, 417 (N.C. Ct. 2009)

338.    During the August 18, 2021, Motion for Sanctions Hearing, the Court did not consider any lesser sanction. Mr. and Mrs. Aseltine, through their attorneys, requested a continuance and additional time to receive and produce any additional records, but were denied the continuance. (Trial Tr. at 64.)   The granting of the continuance could have allowed Mr. and Mrs. Aseltine an opportunity to secure additional documents, necessary subject to the IDEA's five-day disclosure rule.  The continuance request was made on August 18, 2021. (*Id*.)  Mr. and Mrs. Aseltine had already decided to

63

withdraw and transfer C.A. to a specialized private school for children with disabilities so an additional continuance would not have prejudiced either party; however, sanctions resulting in a dismissal grossly prejudiced the Aseltines. At no point during the August 18, 2021, Motion for Sanctions hearing did the Court meaningfully consider any lesser sanction, as was its duty under the *Batlle* standard. Because the Court failed to consider lesser sanction on the Aseltines, its August 23, 2021, Final Decision Order of Dismissal was made in error and an abuse of discretion.

339. "Whenever a due process complaint is received under § 300.507 or § 300.532, the parents or the LEA involved in the dispute must have an opportunity for an impartial due process hearing, consistent with the procedures in §§ 300.507, 300.508, and 300.510." 34 C.F.R. § 300.511(a).

340. The Court did not draft its own decision and essentially excepted the proposed final decision from Respondent with very few changes. It is patently unfair to Mr. and Mrs. Aseltine for the Court to allow the Defendant to draft the Final Decision Order of Dismissal and include items and information that were not made available to the court or reviewed by the court. The Defendant is not the state educational agency or an administrative law judge. There is no way the Defendant would fairly and impartially write an order on behalf of the Court.

341. Because the Defendant's attorney, not the Honorable Judge Malherbe, drafted the Final Order with very little change, the decision was not regularly made.

342. Moreover, because the Defendant's attorney told ALJ Malherbe what she must include in the order, the decision was not regularly made and not based upon an actual consideration of lesser sanctions.

343. Furthermore, the Final Order was in error and denied the Plaintiffs the opportunity to have their due process claims heard.

344. Also, evidence of error was the issuance of conflicting orders by ALJ Malherbe on July 21, 2021.

345. Because ALJ Malherbe issued conflicting orders, one in conflict with the laws of the IDEA and State Policy, Mr. and Mrs. Aseltine were trapped between two conflicting orders.

346. Moreover, only one such order was in compliance with the IDEA, yet that was the order ALJ Malherbe chose to ignore when issuing her Final Order in the matter.

347. ALJ Malherbe could have rectified this conflict by granting the Petitioners continuance on August 18, 2021, or by considering any manner or lesser severe sanctions when it was quite clear there were conflicting orders. Instead, the Court dismissed the matter depriving C.A. to demonstrate how he was denied a FAPE over discovery.

348. The evidence clearly shows that the Final Decision was not carefully considered and regularly made.

## COUNT III

*Appeal of SRO Decision*

349. Plaintiffs incorporate all preceding paragraphs into this Count by reference as if fully stated herein.

350. Plaintiffs are a "party aggrieved" by the SRO Decision within the meaning of 20 U.S.C. §1415(i)(2)(A).

351. Plaintiffs assert that the SRO Decision does not meet the standard of being careful and thorough, and therefore should not be accorded the deference, which the Court in its discretion, may provide to an administrative decision by a State Review Officer. Moreover, the SRO Decision is not entitled to "due weight" as that phrase is used in the IDEA, because the SRO relied upon findings of fact that were not regularly made and made erroneous conclusions of law.

352. For a number of reasons, including, but not limited to, the reasons set forth below, the Plaintiffs respectfully request this Court reverse the SRO Decision.

353. The SRO has the power to reverse the ALJ's Final Decision Order of Dismissal if the ALJ abused her discretion when issuing the Order. *Wagoner v. Elkin City Sch.'s Bd. of Educ.*, 113 N.C. App. 579, 585 (N.C. Ct. App. 1994).

354. The State Review Officer (SRO) must render an independent decision, giving "due weight" to the administrative proceedings before the administrative law judge. *Bd. of Educ. v. Rowley*, 458 U.S. 176 (1982). In *Doyle v. Arlington Cty. Sch. Bd.*, 953 F.2d 100 (4th Cir. 1991), the Fourth Circuit provided guidance regarding "due weight." The SRO, when "deciding what is the due weight to be given an administrative decision under *Rowley* ... a reviewing court should examine the way in which the

66

state administrative authorities have arrived at their administrative decision and the methods employed." *Id*. If an SRO determines that an Administrative Law Judge's (ALJ) findings were made in accordance with the fact-finding norm, or "regularly made," these findings are entitled to be considered prima facie correct. *Id*. at 105. A decision or finding is not considered to be "regularly made" where it is so far from the accepted norm that the SRO cannot give "due weight" to that decision or finding. *Id*. At 104. On appeal from an administrative decision, if the SRO chooses to depart from the prima facie correct decisions, the SRO should explain the departure. *Id*.

355.    When reviewing an appeal of an ALJ's decision, the SRO may only review the specific issues being appealed by the parties. *E.L. v. Chapel Hill-Carrboro Bd. of Educ*., 975 F. Supp. 2d 528, 535 (M.D.N.C. 2013).

356.    The SRO, in making a decision should consider supplemental material in accordance with N.C. Policy 15-4-1.15(iii) and the Memorandum of Understanding ("MOU") between the Office of Administrative Hearings ("OAH") and Department of Public Instruction ("DPI"), the State Educational Agency ("SEA") in North Carolina.

357.    In the OAH Decision, no findings of fact were made regarding the Defendant's alleged denial of a FAPE to C.A. for the 2019-20 or 2020-21 school years under the Individuals with Disability Education (Improvement) Act, 20 U.S.C. §§ 1414 et seq.,("IDEA"), and concomitant provisions of North Carolina law applicable to the education of children with disabilities, N.C. Gen. Stat. §§ 115C-106.1 et seq., and NC DPI Policy 1500 et seq. Like the OAH Decision, no findings of fact were made

regarding claims under Section 504, 29 U.S.C. §794, and the ADA, 42 U.S.C. §§ 12131 *et. seq.*,

358. Further, no actual evidence of the thousands of pages of discovery responses the Plaintiffs had provided to the Defendants were considered or included in the record.

359. Plaintiffs attempted to supplement the administrative record with necessary information including evidence of discovery responses provided to Defendants.

360. In their attempt to supplement the record, Plaintiffs submitted fourteen exhibits including evidence of and ongoing production of responsive discovery requests. The exhibits included:

- A June 29, 2021 Psychoeducational Evaluation;
- A February 15, 2021 Speech Language Audition Assessment;
- An Email from ALJ Malherbe's paralegal Ms. Tsuprenko dated July 19, 2021;
- Emails dated July 20 & 26, 2021;
- An email form Polly Lilly from NC DPI to Ms. Aseltine regarding the ability to file Due Process on matters alleged in a state complaint;
- Petitioners Discovery responses dated June 18, July 6, 18, 21, & 30, 2021;
- Petitioners' Production of Documents dated August 9 & 18, 2021.
- July 23 & 27, 2021 Offer of Reasonable Compliance.

361. SRO Walters failed to consider necessary information in making a determination in the case although Plaintiffs attempted to submit this necessary information pursuant to state law. SRO Walters refused to consider it.

362. The SRO must render an independent decision, giving "due weight" to the administrative proceedings before the administrative law judge. *Board of Education v. Rowley*, 458 U.S. 176 (1982). In *Doyle v. Arlington Cty. Sch. Bd.*, 953 F.2d 100 (4th

Cir. 1991), the Fourth Circuit provided guidance regarding "due weight." A decision or finding is not considered to be "regularly made" where it is so far from the accepted norm that the SRO cannot give "due weight" to that decision or finding. *Id*. At 104.

363.   The record was absent evidence of discovery by either party. The Petition was dismissed without consideration of necessary records showing the production of discovery and correspondence between the parties regarding this matter.

364.   Moreover, Plaintiffs assert there were alternatives to the denial to be heard that would not have resulted in a complete dismissal of their case at the administrative level.

365.   The record shows that Plaintiffs asked for a continuance but it not only was not granted, the request was not considered by ALJ Malherbe. The SRO decision did not take this fact into consideration.

366.   Moreover, the SRO decision did not address the absence in the administrative record of facts showing a consideration of lesser sanctions by ALJ Malherbe.

367.   The record was absent evidence of discovery by either party yet crucial decisions were made on the matter of discovery alone.

368.   Despite the absence of evidence of discovery, affidavits were submitted and all documents Plaintiffs had in their possession were shared with the Defendant.

369.   Furthermore, the Defendant had control of many of the same records being requested of the Plaintiffs through discovery.

370. Because SRO Walters failed to consider necessary evidence, his decision was not regularly made. Further because SRO Walters had the ability to but refused to consider this necessary information, his decision was an abuse of judicial discretion.

371. Plaintiffs respectfully request the Court reverses the Decision of SRO Walters in its entirety.

## **COUNT IV**

*Discrimination Based on Disability in Violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 et seq.*

372. Plaintiffs incorporate all preceding paragraphs into this Count by reference as if fully stated herein.

373. C.A. is a "handicapped person" as defined by the regulations of Section 504 of the Rehabilitation Act ("Section 504"). 34 C.F.R. 104(3)(j)(1); 34 C.F.R. 103(3)(l)(2).

374. Defendant is a "recipient of Federal financial assistance from the Department of Education" that operate a program or activity as defined by the regulations of Section 504. 34 C.F.R. 104.3(f); 34 C.F.R. 104.3(k).

375. From C.A.'s enrollment in Corvian, Defendant discriminated against C.A. by excluding him from participation in a program and denying him the benefits of a program solely on the basis of his disability in violation of Section 504 of the Rehabilitation Act. 29 U.S.C. § 794 *et seq.*; 34 C.F.R. 104.38; 34 C.F.R. 104.34.

70

376. Defendant acted in bad faith and demonstrated gross misjudgment based solely on his disability when it refused to "place [C.A.] in the regular educational environment operated by [Defendant]" and did not "demonstrate[] . . . that the education of [C.A.] in the regular environment with the use of supplementary aids and services [could] not be achieved satisfactorily." 34 C.F.R. 104.34(a).

377. Defendant acted in bad faith and demonstrated gross misjudgment based solely on his disability when it failed to implement the placement procedures required by Section 504 and failed to "ensure that the placement decision [was] made in conformity with 104.34." 34 C.F.R. 1-4.35(c).

378. Defendant acted in bad faith and demonstrated gross misjudgment based solely on his disability when it failed to provide C.A. with a FAPE and reasonable accommodations due to his disability-related needs and behaviors.

379. Defendant acted in bad faith and demonstrated gross misjudgment based solely on his disability when it refused to allow C.A. to access his education in-person with access to his non-disabled peers

380. Defendant acted in bad faith and demonstrated gross misjudgment based solely on his disability when it denied C.A. the opportunity to participate in an education when it refused to offer him in-person instruction.

381. Defendant acted in bad faith and demonstrated gross misjudgment based solely on his disability when it refused to provide C.A. an appropriate education that was designed to meet his individual educational needs "as adequately as the needs of nonhandicapped persons are met." 34 C.F.R. 104.33(b)(1).

382. Defendant acted in bad faith and demonstrated gross misjudgment based solely because of his disability by allowing its agents to place C.A. in a home hospital virtual setting without providing necessary support and related services that would enable him to access the instruction.

383. Defendant acted in bad faith and demonstrated gross misjudgment based solely because of his disability by allowing its agents to place C.A. in a home hospital virtual environment when it allowed other students the opportunity to receive instruction in-person.

384. Defendant acted in bad faith and demonstrated gross misjudgment based solely because of his disability by keeping C.A. in the home hospital virtual setting after noticing a regression in his academic skills and behaviors. Defendant knew C.A. could not hear video-based lessons yet continued educating him in this manner.

385. Defendant acted in bad faith and demonstrated gross misjudgment based solely because of his disability by forcing Mr. and Mrs. Aseltine. to accept placement in the home hospital virtual setting and to accept the contingency plan without holding an IEP

72

meeting resulting in C.A. not making progress on his IEP goals, not receiving sufficient related services to make progress, not being provided sufficient behavioral supports, and not receiving appropriate related services.

386. As a result of the home hospital virtual setting, C.A. did not progress academically and lost out on critical speech language and occupational therapy related services related to his communication needs. Furthermore, C.A. has experienced a negative impact on his ability to function in the academic setting which could result in a negative impact on his employability, earnings, and earning capacity.

387. Defendant acted in bad faith and demonstrated gross misjudgment based solely on his disability when it failed to provide C.A. with appropriate auxiliary aides, services, accommodations, and modifications to allow him to effectively communicate.

388. As a direct and proximate result of Defendants' violation of Section 504, Plaintiffs sustained, and continue to sustain, damages in excess of TEN THOUSAND DOLLARS ($10,000.00), the amount to be determined at trial.

## COUNT V

*Discrimination Based on Disability in Violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.*

389. Plaintiffs incorporate all preceding paragraphs into this Count by reference as if fully stated herein.

390. C.A. is a "qualified individual with a disability," as defined by the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131(2).

391. Defendant is a "public entity" within the meaning of the Americans with Disabilities Act, 42 U.S.C. § 12132.

392. Title II of the ADA and Section 504 are closely related, and "there is no significant difference in the analysis of rights and obligations created by the two Acts." *K.M. v. Tustin Unified Sch. Dist.*, 725 F.3d 1088 (9th Cir. 2013) (quoting *Vinson v. Thomas*, 288 F.3d 1145, 1152 n.7 (9th Cir. 2002)).

393. Defendant discriminated against C.A. by failing to provide his appropriate auxiliary aids and services where necessary to afford C.A. an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity, in violation of the Americans with Disabilities Act, 28 C.F.R. § 35.160(b)(1).

394. Individual employees of Defendant were acting in their official capacities during the period of time the Defendants discriminated against C.A. based on his disabilities.

395. Defendant discriminated against C.A. by excluding him from participation in a program and denying him the benefits of the services, programs, and activities of a public entity, Corvian, because of his disability, in violation of the Americans with Disabilities Act, 42 U.S.C. § 12132.

396.    Defendant knew C.A. was being discriminated against due to his disabilities when he was not provided appropriate academic and behavioral supports and regressed significantly. Defendant knew C.A. had limited hearing and significant communication needs yet failed to provide him with services he could fully access during the forced home hospital virtual placement although other students were given the opportunity to receive their academic and related services in-person.

397.    Defendant discriminated against C.A. when it failed to provide appropriate behavioral supports to reduce C.A.'s maladaptive behaviors, refused to conduct an FBA or BIP, denied C.A. in-person speech-language and occupational therapy services despite C.A.'s individualized needs for those services, failed to adjust or provide different services to C.A. to accommodate his disability, and encouraged others to support the decision to keep C.A. in a forced home hospital virtual setting without in-person access to his peers.

398.    Defendant discriminated against C.A. when it forced Mr. and Mrs. Aseltine to agree to the home hospital virtual setting even though it was able to but refused to provide C.A. with in-person educational and related services.

399.    Defendant further discriminated against C.A. when it told Mr. and Mrs. Aseltine that it would only accommodate C.A. 's needs if they withdrew their State Complaint, which they refused to do.

400. Defendant intentionally discriminated against C.A. when it failed to provide him with the auxiliary aides, services, accommodations, and resources to allow him to effectively communicate.

401. Defendant intentionally discriminated against C.A. when it failed to provide him with the translators, text-to-speech, speech-to-text, assistive technology evaluations, and other supports that would allow a hearing-impaired, non-reading and writing student to benefit from its program.

402. The law provides:

> No person may discharge, intimidate, retaliate, threaten, coerce or otherwise discriminate against any person because such person has filed a complaint, furnished information, assisted or participated in any manner in an investigation, review, hearing or any other activity related to the administration of, or exercise of authority under, or privilege secured by section 504 and the regulations in this part.

29 C.F.R. § 33.13.

403. Defendant retaliated against C.A.'s parents for asserting his rights by keeping C.A. in a forced home hospital virtual environment with services provided under a contingency plan rather than his IEP because they refused to withdraw their State Complaint.

404. Defendant Board supervised and directly controlled the actions of Defendant when its agents discriminated and retaliated against the C.A. and Mr. and Mrs. Aseltine.

405.    As a result of Defendants' failure to comply with the ADA, C.A. did not develop appropriate academic, social, behavioral, and communication skills, and has experienced stunted academic, behavioral, communication, and social growth.

406.    As a result of the home hospital virtual setting, C.A. experienced academic challenges and lost out on critical speech language and occupational therapy related services related to his communication needs. Furthermore, C.A. has experienced a negative impact on his ability to function in the academic setting which could result in a negative impact on his employability, earnings, and earning capacity.

407.    As a direct and proximate result of Defendants' violation of the Americans with Disabilities Act, Plaintiffs sustained, and continue to sustain, damages in excess of TEN THOUSAND DOLLARS ($10,000.00), the amount to be determined at trial.

## COUNT VI

*Violation of the Fourteenth Amendment*
*42 U.S.C. § 1983*

386.    Plaintiffs incorporate all preceding paragraphs into this Count by reference as if fully stated herein.

387.    Under the Fourteenth Amendment, C.A. had the right as a public-school student to equal access to an educational environment free from discrimination and equal protection of the laws.

77

388. Plaintiff was denied the right to have his Due Process claims heard pursuant to the IDEA under 20 U.S.C. § 1400, *et. seq.*

389. Defendant, Defendant Board, and its agents were at the time of events related to this complaint persons acting under color of state law, empowered and required by the State of North Carolina, including the State Constitution, to, among other things, provide C.A. a sound basic education and ensure an open and safe environment for educational services, free from disability-based discrimination.

390. Defendant and Defendant Board discriminated against C.A. based on his disability and in violation of his right to equal protection of the laws. For example:

a) Defendant Board established a custom, policy, and practice of discriminating against children with HI and learning disabilities and failing to enforce the LRE mandate of the IDEA and Section 504 by:

    i.    Implementing a widespread discriminatory practice whereby Defendant refused to provide children with HI, like C.A., with in-person special education;

    ii.    Implementing a widespread discriminatory practice whereby Defendant refused to provide children with in-person educational services in the regular education classroom;

    iii.    Implementing a widespread discriminatory practice whereby Defendant failed to provide children with Autism and intellectual disabilities, like C.A., with sufficient special education and related services;

78

iv.     Overseeing the development of C.A.'s IEPs and the educational program and services provided to C.A. by his teachers, and permitting, or causing to be permitted, the discrimination of C.A. and the segregation of C.A. from his non-disabled peers;

v.      Failing to allow Mr. and Mrs. Aseltine. to meaningfully participate in C.A.'s IEP meetings;

vi.     Predetermining C.A.'s home hospital virtual placement despite evidence that such a program was ineffective and that he would regress in a virtual setting due to his multiple disabilities, but especially due to his HI related service needs;

vii.    Failing to provide necessary related services such as speech-language and occupational therapy in-person due to C.A.'s HI;

viii.   Failing to ensure Defendant's agents, as members of C.A.'s IEP Teams, complied with and carried out their responsibilities pursuant to the IDEA, Section 504, and the Constitution to not discriminate against individuals with disabilities and to educate children in the LRE;

ix.     Developing policies that impeded parent's ability to request and receive independent education evaluations after disagreeing in writing and misinterpreting the laws on the provision of independent education evaluations to deny parents the right to receive them;

x.      Developing policies that resulted in Defendant refusing to consider results of independent educational evaluations;

79

xi.     Failing to ensure parents of children with Autism and intellectual disabilities, like C.A. and R.A., were full participants in IEP meetings;

xii.    Failing to train the members of C.A.'s IEP Teams, on the IDEA and Section 504; and

xiii.   Failing to hire or contract with any specialist to assist with the instruction of children with HI and learning disabilities, like C.A.

b) Defendant intentionally treated children with HI and learning disabilities differently than their nondisabled peers in violation of their constitutional and statutory rights by:

i.      Implementing a widespread discriminatory practice whereby they refused to provide children with HI in-person special education services;

ii.     Implementing a widespread discriminatory practice whereby Defendant refused to provide students with learning disabilities, like C.A., with sufficient special education and related services if their parents assert their rights under the IDEA and Section 504 for their child to be educated in the least restrictive environment;

iii.    Overseeing the development of C.A.'s IEPs and the educational program and services provided to C.A. by his teachers, and permitting, or causing to be permitted, the discrimination of C.A. and failure to provide C.A. with his educational program and related services in the least restrictive environment by forcing him to receive virtual home hospital services rather than in-person services;

80

iv. Participating in C.A.'s IEP meetings in which the IEP Team repeatedly failed to revise C.A.'s IEP goals and related services depriving him of an opportunity to receive an education on par with his non-disabled peers;

v. Failing to implement C.A.'s IEP as written and falsely reporting to C.A.'s parents the services being provided to C.A. comported with his IEP;

vi. Allowing members of C.A.'s IEP team to predetermine his placement to a virtual home hospital setting depriving Mr. and Mrs. Aseltine an opportunity to participate in C.A.'s special education and related services simply due to a flood and claims of space constraints and not considering A.C.'s needs;

vii. Misinterpreting the relevant law to prohibit parents of children with disabilities from requesting independent education evaluations after disagreeing in writing and further refusing to consider independent educational evaluations after they were obtained;

viii. Failing to ensure parents of children with disabilities, like Mr. and Mrs. Aseltine, were full participants in IEP meetings;

ix. Failing to train members of C.A.'s IEP Teams, including Mr. and Mrs. Aseltine, on the IDEA and Section 504;

392. The acts by Defendants constitute a disregard for, and deliberate indifference to, C.A.'s constitutionally protected interests, including his property interest in educational benefits

and liberty interest in the freedom to gain the requisite skills for independent living, under the Fourteenth Amendment to the United States Constitution.

393.   Defendants knew or should have known that their response to Plaintiffs' requests for C.A. to receive academic instruction in a classroom with appropriate supplementary aides and services was contrary to the least restrictive environment mandates of the IDEA and other laws.

394.   As a result of the segregation, C.A. did not develop appropriate academic skills, and has experienced stunted academic, communication, and behavioral growth. Moreover, C.A. significantly regressed due to the segregation and forced virtual home hospital placement, which was not related to the COVID-19 pandemic.

395.   As a result of the segregation, C.A. has experienced a negative educational impact which could result in lost future educational opportunities, lost employment opportunities, lost wages and reduced income potential.

396.   Defendants' actions and omissions were the proximate cause of Plaintiff's injuries, including lost educational opportunity.

397.   As a direct and proximate result of Defendants' violation of the Fourteenth Amendment, Plaintiffs sustained, and continue to sustain, damages in excess of TEN THOUSAND DOLLARS ($10,000.00), the amount to be determined at trial.

## COUNT VII

(Attorney's Fees and Costs)

398.    Plaintiffs incorporate all preceding paragraphs into this Count by reference as if fully stated herein.

399.    Because no decision was made regarding the claims alleged through the Plaintiffs' Due Process Petition and claims were administratively dismissed without providing C.A. the right to be heard on his claims for denial of FAPE and violation of Section 504 and Title II of the ADA, a prevailing party decision was also not made.

400.    The IDEA provides that Plaintiffs may seek reimbursement for their reasonable attorneys' fees (including costs), subject to the discretion of this District Court.

401.    Plaintiffs reserve the right to amend this claim for relief to include a request for reimbursement of additional reasonable attorneys' fees (including costs), again subject to the discretion of this district court, which are incurred in this proceeding should Plaintiffs be designated as a prevailing party.

## PRAYER FOR RELIEF

NOW WHEREFORE, Plaintiffs respectfully request that judgment be entered in their favor and against Defendants, and that this Court issue an Order:

a)  Declaring:

1.  Defendant failed to provide a free appropriate public education to C.A. during the 2019-20 and 2020-21 school years;

2.  Plaintiffs are the prevailing party in this matter;

3. The administrative dismissal for reasons related to discovery was improper and denied C.A. his due process rights and deprived him of his rights under the IDEA, Section 504, the ADA, and the Fourteenth Amendment;

b) Ordering:
    i. Reverse SRO Decision to uphold ALJ Malherbe's dismissal of the case.

    ii. Defendant to place C.A. in a private school placement and provide transportation to and from the private school placement;

    iii. Defendants provide compensatory education and related services in an amount and frequency that the Court deems sufficient to remedy the regression and harm caused to C.A. as a result of the failure to provide C.A. with a FAPE, including, but not limited to, evaluations, academic tutoring, speech language services, occupational therapy, and other related services;

c) Awarding:
    i. Plaintiffs all "appropriate relief" available under the IDEA to remedy the harms caused by Defendants' failure to provide C.A. a free appropriate public education;

    ii. Plaintiffs the costs, including attorneys' fees, in connection with this action and all of the proceedings below, pursuant to 20 U.S.C. § 1415;

    iii. All other and further appropriate relief available under the IDEA;

d) Damages for Plaintiffs including, but not limited to expenses incurred as a result of the violations of C.A.'s civil rights and the long-term costs resulting from the failure to provide C.A. a FAPE in a non-segregated setting, including loss of employment, loss of freedom,

84

loss of independence and independent living, loss of further education, and any other loss, incurred as a result of Defendants' violations of C.A.'s civil rights; and

e) Punitive damages in an amount sufficient to punish Defendants and deter others from like conduct.

f) Ordering Defendant to reimburse Plaintiffs all costs, expert witness expenses, and expenses incurred in litigating this matter including, but not limited to: expert witness fees, depositions, and court costs;

g) Ordering Defendant to reimburse Plaintiffs for all costs incurred due to Defendants' failure to provide C.A. appropriate services;

h) Award Plaintiffs all attorneys' fees pursuant to § 1988 for all fees incurred in litigating claims raised under § 1983;

i) Award Plaintiffs all attorneys' fees, including litigation expenses and costs, incurred in litigating all claims raised under the fee-shifting provisions of the IDEA, Section 504, and the ADA; and

j) Awarding any other relief this Court deems just and proper.

## **JURY DEMAND**

NOW COME the Plaintiffs, C.A., a minor, and Mr. and Mrs. Aseltine, individually and on behalf of C.A., by and through their attorney, The Law Offices of Keith L. Howard, PLLC. and demand a trial by jury.

Respectfully submitted, this the 26th day of January, 2022.

By:

/s/Keith Lamar Pryor Howard
Keith Lamar Pryor Howard
NC State Bar No.: 32258
Co-Counsel for Plaintiffs
The Law Offices of Keith L. Howard, PLLC
19109 W. Catawba Ave., Ste. 200
Cornelius, NC 28031
Telephone: 919-824-0146
Facsimile No.: 1-800-341-3931
Email: keithh@khowardlaw.com

/s/Carla Fassbender
Carla Fassbender
N.C. Bar No. 55210
Co-Counsel for Plaintiffs
The Law Offices of Keith Howard, PLLC
19109 W. Catawba Ave.
Ste. 200
Cornelius, NC 28031
Fax: 800-341-3931
Phone: 704-612-4151
Email: carlaf@khowardlaw.com

/s/ Kelli Espaillat
Kelli Espaillat
N.C. Bar No. 44369
Co-Counsel for Plaintiffs
Kincaid and Associates, PLLC
101 North McDowell Street
Suite 120
Charlotte, NC 28204
Phone: 910-765-0853
Fax: 910-401-1128
Email: kespaillat@kincaidandassociates.com

86

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CASE NO.:

C.A., a minor, by his parents and legal
guardians, C.A. and R.A.,

      Plaintiffs,

v.

BOARD OF DIRECTORS OF CORVIAN
COMMUNITY SCHOOL, and CORVIAN
COMMUNITY SCHOOL,

      Defendant.

_____

## JURY DEMAND

NOW COME Plaintiff C.A., a minor, and C.A. and R.A. individually and on behalf of C.A., by and through their attorney, The Law Offices of Keith L. Howard, PLLC, and demand a trial by jury.

Respectfully submitted  this the 26th day of January, 2022.

      By:

        /s/Keith Lamar Pryor Howard
        Keith Lamar Pryor Howard
        N.C. Bar No. 32258
        The Law Offices of Keith Howard, PLLC
        19109 W. Catawba Ave.
        Ste. 200
        Cornelius, NC 28031
        Fax: 800-341-3931
        Phone: 704-612-4151
        Email: keithh@khowardlaw.com

87

/s/Carla Fassbender
Carla Fassbender
N.C. Bar No. 55210
The Law Offices of Keith Howard, PLLC
19109 W. Catawba Ave.
Ste. 200
Cornelius, NC 28031
Fax: 800-341-3931
Phone: 704-612-4151
Email: carlaf@khowardlaw.com

/s/ Kelli Espaillat
Kelli Espaillat
N.C. Bar No. 44369
Kincaid and Associates, PLLC
101 North McDowell Street
Suite 120
Charlotte, NC 28204
Phone: 910-765-0853
Fax: 910-401-1128
Email: kespaillat@kincaidandassociates.com

88